Fuld, J.
On this appeal, here by permission of the Appellate Division, we deal with the validity of a districting plan for an elective legislative body below the state level.[1]
*98 In January of this year, the plaintiffs, residents and qualified voters of the City of Binghamton, instituted an action against the several defendants, constituting the Common Council of that city, seeking to have the existing districting plan of that 13-member body declared unconstitutional on the ground that it offended against the equal protection clauses of the Federal and State Constitutions (U. S. Const., 14th Amdt.; N. Y. Const., art. I, § 11). Following the commencement of the action, the Mayor of Binghamton was added as a party defendant and four of the councilmen, all members of the political party with minority representation on that body, originally named as defendants were permitted to intervene and serve their own papers in support of the plaintiffs’ position. The remaining defendants moved to dismiss the action, pursuant to CPLR 3211 (a), primarily on the ground that the court lacked jurisdiction of the subject matter of the action because, in their words, “ the federal courts have exclusive jurisdiction ” of such eases. The plaintiffs countered by requesting that the motion be treated as one for summary judgment (CPLR 3211 [c]) and that such relief be granted in their favor.
Justice Sloan at Special Term concluded that no triable issue of fact existed and directed summary judgment for the plaintiffs. In so doing, he declared that 1 ‘ the present scheme * * * deprives each of the plaintiffs of his right to equal representation in violation of the Fourteenth Amendment of the Federal Constitution, and section 11 of article I of the the Constitution of the State of New York”. (45 Misc 2d 940, 943-944.) The court also announced that it would retain jurisdiction of the action in order that it might thereafter entertain ‘1 an application by any of the parties for a review of any * * * plan adopted by local law ”. (45 Misc 2d, at p. 944.) No appeal was taken from that determination.
Following a public hearing in April, the Binghamton Common Council passed Local Law No. 1 of 1965, adopting a new districting plan. Approved by the defendant Mayor, it was thereafter filed with the Broome County Board of Elections for the purpose of being submitted, pursuant to section 23 of the Municipal Home Rule Law, to a referendum. However, before the date set for such submission, Justice Sloan, upon *99 application of the plaintiffs and the intervening defendants, held that the proposed districting plan still failed to meet constitutional requirements. The Appellate Division affirmed without opinion and, as indicated, granted the defendants leave to appeal to this court.
As presently constituted, the Binghamton Common Council is made up of 13 members. Each is elected by the inhabitants of one of the city’s 13 “ wards ’ ’ and has the power to cast one vote, of equal weight with the others, on matters coming before the Council. According to the latest United States census, that of 1960, the population of the wards varies from 542 in the 9th ward to 11,426 in the 4th ward. In fact, on the basis of the existing scheme, it is possible for 7 councilmen — those from the 2d, 13th and 7th through 11th wards — representing less than 27% of the population of the city to enact laws opposed by and, by the same token, to defeat legislation favored by members representing over 73% of Binghamton’s citizens.[2]
By the terms of Local Law No. 1 of 1965, enacted after Special Term’s decision invalidating the existing plan, it was proposed that the Council be reduced from 13 to 7 members, each to be elected from one of seven ‘ ‘ districts ’ ’, the boundaries of which would follow those of the former “ wards ” with certain of the less populous wards simply being incorporated into the new and larger districts. The population of each of the new districts — *100 again, as indicated by the 1960 census — varies from 7,863 in the 6th district to 15,808 in the 7th district.[3]
The defendants attempt to justify the new plan by proffering and relying upon population figures based not on the 1960 census but on their own surveys and estimates which, it is to be noted, reduce somewhat the discrepancies between the various districts:

District Population

1 9,615
2 10,501
3 10,600
4 11,588
5 9,640
6 8,640
7 12,003
These estimates, employed by the Council in drafting the new plan, were arrived at, first, by ‘ ‘ up-dating ’ ’ the 1960 census figures, by taking into account, in the defendants ’ words, ‘ ‘ various factors which affect the population [of Binghamton] such as movement of people, downtown urban renewal, extensive highway construction, and future available areas for expansion, all based on proper statistical projection of known facts ’ ’, and, second, by excluding the 3,217 persons (included by the census) who are patients in the Binghamton State Hospital located within the new 7th district.
Reasoning that “ [Residents in or at the Binghamton State Hospital are. a part of the population and may not be eliminated from * * * proposed Councilmanic District No. 7 ” and that “ [t]he approximations of increase and decrease of population by reason of population movement and other factors are *101 at best estimates and are not to be accepted in lieu of the Federal census ” (46 Misc 2d 289, 291), Justice Sloan at Special Term rejected the defendants’ population figures and, looking to the data supplied by the 1960 census, concluded that the Local Law did not meet constitutional requirements.
The present action was, of course, prompted by recent Supreme Court eases holding that the equal protection clause of the Fourteenth Amendment requires that representation in both houses of a state’s legislature be substantially proportionate to the number of people represented under the principle of 11 one person, one vote. ’ ’[4] There can be little doubt, and it is not disputed by the defendants, that that principle is applicable to elective legislative bodies exercising general governmental powers at the municipal level (cf. Reynolds v. Sims, 377 U. S. 533, 575; Gomillion v. Lightfoot, 364 U. S. 339), and such has been the conclusion reached by several courts called upon to consider the question.[5]
/ It is axiomatic that local governmental units are creations of, and exercise only those powers delegated to them by, the State (N. Y. Const., art. IX, §§ 1, 2; Municipal Home Rule Law, §§ 10, 11) and, certainly, if the latter may exercise its legislative powers only in a body constituted on a population basis, any general elective municipal organ to which it delegates certain of its powers must, by a parity of reasoning, be subjected to the *102 same constitutional requirement! Viewed in another way, if, as seems evident, the thrust of the Supreme Court’s decisions is that it is inherent within the concept of “ equal protection ” that a person has a substantial right to be heard and to participate, through his elected representatives, in the business of government on an equal basis with all other individuals, no reason or justification exists for differentiating, so far as that right is concerned, between the general governmental business carried on in the highest legislative organs of the State and that conducted, by virtue of a delegation of authority, in municipal law-making bodies. (See, generally, Weinstein, The Effect of the Federal Reapportionment Decisions on Counties and Other Forms of Municipal Government, 65 Col. L. Rev. 21.)
Nor can there be any question that the courts of New York, obliged as they are to uphold the Federal Constitution as well as this State’s Constitution—whose equal protection clause, we have said, is as broad in its coverage as that of the Fourteenth Amendment (see Dorsey v. Stuyvesant Town Corp., 299 N. Y. 512, 530, 544) — are vested with jurisdiction of actions brought to vindicate the right to equal representation. (See Matter of Orans, 15 N Y 2d 339; Maryland Committee v. Tawes, 377 U. S. 656, 674.)
This brings us to that aspect of the decision below invalidating Binghamton’s Local Law No. 1 of 1965.
The ‘ ‘ overriding objective ’ ’ of any legislative apportionment (or districting) plan, the Supreme Court has made clear, “ must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen”. (Reynolds v. Sims, 377 U. S. 533, 579, supra.) In light of this objective, “ the proper judicial approach ” in evaluating the constitutional validity of any particular plan, the court went on to say in a companion case to Reynolds, “is to ascertain whether, under the particular circumstances existing ’ ’ in the individual locality whose legislative scheme is in issue, ‘ ‘ there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination”. (Roman v. Sincock, 377 U. S. 695, 710.) Judged in these terms, the Binghamton plan now before us may not withstand attack.
*103 Even accepting the defendants’ own population figures (i.e., those used by the Council in adopting the Local Law and arrived at by “ up-dating ” the 1960 census and excluding from district No. 7 the patients at the State Hospital), significant population discrepancies exist between certain of the seven councilmanic districts. For instance, although each district is allotted but one representative and, thus, one vote on the Council, district No. 7 (population: 12,003) includes nearly 50% more people than district No. 6 (population: 8,640), and almost as serious discrepancies exist between district No. 1 (population: 9,615) or district No. 5 (population: 9,640) and district No. 4 (population: 11,588) or district No. 7.
Manifestly, then, Local Law No. 1, far from representing, to cull from the opinion in the Roman case (377 U. S. 695, 710, supra), “ a faithful adherence to a plan of population-based representation ”, perpetuates a denial of the right of many of Binghamton’s citizens to equal protection of the law in their representation on the Common Council. Not only do the defendants ’ population figures demonstrate that the revised districting scheme entails more than a “ minor deviation” from the “ one person, one vote ” principle but no special considerations or factors are called to our attention to rationally explain the patent discrepancies. On the contrary, Binghamton’s relatively small population— 75,941, according to the 1960 census — and rather compact geographic area suggest that the task of redistricting its Common Council, so as to assure to its citizens a closer approximation to equality of representation than that provided by Local Law No. 1, is a responsibility which may be met without great difficulty. To paraphrase what we said in Matter of Sherrill v. O’Brien (188 N. Y. 185, 210), no possible legitimate purpose for the exercise of discretion to create districts unequal in population has been shown.
The disparities of population among the councilmanic districts created by the Local Law are, to some extent, more acute when the numerical size of those units is gauged by the 1960 census figures. To take but one example, district No. 7 (population: 15,808), under those calculations, contains over 100% more people than district No. 6 (population: 7,863). In our opinion, the courts below correctly held that (1) the latest official census is to be employed in determining population for districting pur *104 poses and (2) the patients at the State Hospital are properly to he included (as they are in the 1960 Federal census) as part of the population of the district wherein that hospital is located.
A municipality may not devise its own method of calculating population as a basis for deriving a districting plan for its elective law-making body where the state has, by Constitution or statute, mandated that population be determined in a prescribed manner.[6] In our view, Hew York has adopted such a prescription./For instance, this State’s Constitution (art. III, § 4) makes the latest Federal census ‘ ‘ controlling as to the number of inhabitants in the state or any part thereof” for purposes of State legislative apportionment, and numerous statutes likewise make that census the determinant whenever “ population ” is a factor to be taken into account.[7] Particularly significant is section 11 of the Optional City Government Law (L. 1914, ch. 444, repealed L. 1939, ch. 765 but “ frozen ” as to city governments, such as Binghamton, adopted under its authority) which, in effect, requires that "the latest state census or United States census, whichever shall be later ”, be employed to determine “ the number of inhabitants of a city ” whenever such inquiry is pertinent to laws passed by the city’s legislative body.
Although, admittedly, no constitutional or legislative provision specifically deals with “ population ” as it relates to local apportionment or districting, the declared policy is readily apparent and reason dictates that the most recent official census be employed in this area as well. Reliance upon such a source will assure periodic, impartial population data on the basis of which an apportionment or districting plan may be initially developed and thereafter regularly revised.
*105 All that need be said about the patients at the State Hospital is that, in the light of current state policy, the action of the defendants in excluding them from their districting plan without any investigation of relevant factors — such as, for instance, where they had previously lived and where they had voted in the past— is arbitrary and discriminatory. The Federal census, as indicated, includes these patients as residents of Binghamton’s present 12th ward, now within the new 7th district, and no sound reason has been suggested for denying them representation on the city’s Common Council. On the contrary, it seems undisputed that many of the patients are from the Binghamton area and that many were voluntarily admitted to the hospital (Mental Hygiene Law, § 70, subd. 1, par. [a]) and, not having been judicially declared incompetent, are actually entitled to vote (Election Law, § 152, subd. 6). Therefore, to treat these patients, as the defendants have, as if they did not exist is to depart, improperly, from the concept of population-based legislative representation. (See Davis v. Mann, 377 U. S. 678, 691 [relating to exclusion of military personnel].)
The order appealed from should be affirmed, without costs.
Chief Judge Desmond and Judges Dye, Van Voobhis, Burke, Scileppi and Bergan concur.
Order affirmed.

. While the case has been referred to by the parties as one involving “apportionment”, it deals, strictly speaking, with an issue of “districting”. “Apportionment and districting”, it has been said by the Citizens’ Committee on Reapportionment, “must be differentiated. Apportionment is the process by which legislative seats are distributed among units entitled to representation; districting is the establishment of the precise geographical boundaries of each such unit or constituency.” (New York Citizens’ Committee on Reapportionment, Report to Governor Nelson A. Rockefeller [Dec. 1, 1964], p. 25; see, also, Silva, The Population Base for Apportionment of the New York Legislature, 32 Fordham L. Rev. 1, 3.) Of course, constitutional requirements must be met whether apportionment or districting is at issue. (See, e.g., Wright v. Rockefeller, 376 U. S. 52; WMCA v. Lomenzo, 238 F. Supp. 916 [U. S. Dist. Ct., S. D. N. Y.].)

. The following table shows the population of each existing ward:

Ward Population

1 9,999
2 4,016
3 6,515
4 11,426
5 9,013
6 7,863
7 3,658
8 1,064
9 542
10 2,051
11 3,986
12 10,817
13 4,991

. The following table shows the population of each proposed district:

New District Old Ward Population

1 1 9,999
2 7,8,9,10,11 11,301
3 2,3 10,531
4 4 11,426
5 5 9,013
6 6 7,863
7 12,13 15,808

. See Reynolds v. Sims, 377 U. S. 533; WMCA v. Lomenzo, 377 U. S. 633; Maryland Committee v. Tawes, 377 U. S. 656; Davis v. Mann, 377 U. S. 678; Roman v. Sincock, 377 U. S. 695; Lucas v. Colorado Gen. Assembly, 377 U. S. 713.

. See Matter of Goldstein v. Rockefeller, 45 Misc 2d 778 (County Board of Supervisors); State ex rel. Sonneborn v. Sylvester, 26 Wis. 2d 43 (same); Bianchi v. Griffing, 238 F. Supp. 997 (U. S. Dist. Ct., E. D. N. Y.) (same); Damon v. Lauderdale County Election Comrs., National Municipal League, Court Decisions on Legislative Apportionment, vol. 13, p. 139 (Civil Action No. 1197-E, U. S. Dist. Ct., S. D. Miss., Oct. 21, 1964) (same); Brouwer v. Bronkema, National Municipal League, Court Decisions on Legislative Apportionment, vol. 13, p. 81 (Case No. 1855, Cir. Ct., Kent County, Mich., Sept. 11, 1964) (same); McMillan v. Wagner, Civil Action, No. 64-C-2160, U. S. Dist. Ct., S. D. N. Y., March 22, 1965 (City Board of Estimate); Ellis v. Mayor & City Council of City of Baltimore, 234 F. Supp. 945 (U. S. Dist. Ct., D. Md.) (City Council). See, also, Weinstein, The Effect of the Federal Reapportionment Decisions on Counties and Other Forms of Municipal Government, 65 Col. L. Rev. 21, 23-31.

. The method prescribed for determining population may not, of course, be utilized as a subterfuge for circumventing equal voting power standards. (Cf. WMCA v. Lomenzo, 238 F. Supp. 916, 924-925 [U. S. Dist. Ct., S. D. N. Y.]; see, also, Weinstein, The Effect of the Federal Reapportionment Decisions on Counties and Other Forms of Muncipal Government, 65 Col. L. Rev. 21, 24, n. 12.) We do not reach the question whether the method relied upon in devising Local Law No. 1 — if such method were authorized by the State — violated the equal protection clause of the Federal or State Constitution.

. See, e.g., Alternative County Government Law, § 4, subd. 8; General Construction Law, § 37-b, subd. 1; Village Law, § 4-400, subd. 1; former Village Home Rule Law, § 2, subd. 1; Alcoholic Beverage Control Law, § 3, subd. 23; see, also, CPLR 4530, subd. [b]; 2 McQuillin, Municipal Corporations [3d ed. 1949], § 4.76.