I. William **BIANCHI**, Jr., and Quentin B.
Sammis, Plaintiffs,

v.

Evans K. **GRIFFING**, William P. Bain,
Lester M. Albertson, William J. Leon-
ard, Stephen F. Meschutt, Ralph J. Os-
good, Charles R. Dominy, Robert J.
Flynn, Arthur M. Cromarty, and Thom-
as J. Harwood, constituting the Board
of Supervisors of Suffolk County, New
York, Defendants.

Civ. A. No. 62–C–821.

United States District Court
E. D. New York.

June 15, 1966.

though the injunction sought in the complaint was denied, the denial was "without prejudice to renewal in the absence, within a reasonable time, of the political action afforded government bodies to be taken as indicated in the Court's decision herein." Bianchi et al. v. Griffing et al., D.C., 238 F.Supp. 997; appeal dism. 382 U.S. 15, 86 S.Ct. 52, 15 L.Ed. 2d 11 (1965).

■ Gross inequality of individual voter representation amongst the ten towns of the County scarcely can be disputed. Attempting to follow the precepts of the Supreme Court as they relate to constitutional equal protection of the laws with respect to the voting privilege of the individual citizen, the State courts in many of the counties of New York State have directed that such inequalities be remedied and have entered judgments hopefully designed for this purpose.* Although the State court in each malapportioned county would seem to have been better able, because of its more intimate knowledge of the local conditions existing therein, to pass upon the particular relief required to remedy any malapportionment situation, nevertheless the constitutional question is properly in the federal court and jurisdiction cannot be sloughed off.

■ Since "[a]pportionment · is primarily a legislative rather than a judicial function," Graham v. Board of Supervisors, Erie County, 49 Misc.2d 459, 267 N.Y.S.2d 383, 394, this court had hoped that some definitive action would be taken by the Board of Supervisors to

Frederic Block, Port Jefferson, for Bianchi and Sammis.

Richard C. Cahn, Huntington, N. Y., for plaintiff Town of Huntington.

George W. Percy, Jr., County Atty., Riverhead, by Stanley S. Corwin, Asst. County Atty., for Suffolk County.

Before MOORE, Circuit Judge, and BRUCHHAUSEN and DOOLING, District Judges.

MOORE, Circuit Judge.

This proceeding was commenced on July 27, 1962. After hearing argument on September 30, 1963, a judgment was entered on March 3, 1965 wherein, al-

* Seaman v. Fedourich, 46 Misc.2d 289, 258 N.Y.S.2d 1008; 23 A.D.2d 968, 970, 259 N.Y.S.2d 1021; 16 N.Y.2d 94, 262 N.Y.S. 2d 444, 209 N.E.2d 778; 47 Misc.2d 26, 262 N.Y.S.2d 591 (Sup.Ct. Broome Co., 1965).
Shilbury v. Board of Supervisors, Sullivan County, 46 Misc.2d 837, 260 N.Y. S.2d 931 (Sup.Ct. Sullivan Co. 1965), aff'd App.Div., 267 N.Y.S.2d 1022 (Third Dept. 1966).
Angostini v. Lasky, 46 Misc.2d 1058, 262 N.Y.S.2d 594 (Sup.Ct. Broome Co., 1965).
Treiber v. Lanigan, 48 Misc.2d 434, 264 N.Y.S.2d 797 (Sup.Ct. Oneida Co., 1965),

modified 25 A.D.2d 202, 269 N.Y.S.2d 595 (Fourth Dept. 1966).
Town of Greenburgh v. Board of Supervisors, 49 Misc.2d 116, 266 N.Y.S.2d 998 (Sup.Ct. Westchester Co., 1966).
Dona v. Board of Supervisors, 48 Misc. 2d 876, 266 N.Y.S.2d 229 (Sup.Ct. St. Lawrence Co., 1966).
Graham v. Board of Supervisors, Erie County, 49 Misc.2d 459, 267 N.Y.S.2d 383 (Sup.Ct. Erie Co., 1966).
See also,
Lodico v. Board of Supervisors of County of Rockland, et al., 256 F.Supp. 442, (S.D. N.Y., Croake, J., May 20, 1966).

have the Board more equally representative of the voters of the county than is true at the present time. No such action, however, has been taken and plaintiffs, acting under the privilege given to them, in December 1965 renewed their application for relief.

A Committee (25 in number) on Re-Apportionment for the County of Suffolk was appointed by the Board. At its first meeting on December 15, 1965 the Commissioner of the New York State Office of Local Government, John J. Burns, presented his views and an outline of a proposed reapportionment plan which maintained the towns as units having one Supervisor each except that one Supervisor was to be added for each 100,000 of population or fraction thereof for towns of over 100,000 population. Weighted voting on the basis of one vote for each 10,000 of population was to supply the equal protection element. Counsel Milton Alpert referred to instances where the courts themselves had imposed temporary reapportionment.

A second meeting of the Committee was held on January 4, 1966 at which various members offered suggestions as to a legislative body for the County to be elected at large, elected from assembly districts, elected from supervisor districts to be created, or elected from units of population. Arguments for and against weighted voting were advanced.

At subsequent meetings held on February 2, 1966, March 2, 1966, and March 16, 1966, other ideas as to plans were presented and discussed. A vote taken at the March 30, 1966 meeting showed a wide range of views as to the basic units for reapportionment and the weighting of votes.

The meeting of May 4, 1966 voted to submit four plans to the Board. In its report dated May 9, 1966, the Committee presented to the Board four recommended plans: (1) Burns-Klein (Weighted Vote); (2) Lazer Plan "A" (Districting); (3) Albertson (At-Large); and (4) Lundberg Plan "A" (Miscellaneous). At its meeting held on May 31, 1966 two of the four plans were preferred but the Board was unable to express a preference between these two. A local law (Local Law Intro. No. 1—1966, Suffolk County, New York) was introduced at a special meeting of the Board on May 31, 1966; the County Attorney is, however, unable to state that the Local Law is likely to be adopted.

The plans for which the County Board indicated a preference were the Albertson and the Klein (or Klein-Burns) plan. The Albertson plan would provide ten supervisors as at present, one from each town. The county supervisor could also hold the office of town supervisor. However, all county supervisors would be elected by county-wide balloting—the voter in Huntington (and every other town) voting for a slate of ten supervisors, one from each town. Each candidate running county-wide for county supervisor would also be permitted to run simultaneously in his own town for the office of Town Supervisor. The Klein plan would provide for continuing the ten town supervisors as members of the County Board of Supervisors and would accord each of them one vote for each ten thousand persons in his town; towns having over 100,000 of population would elect a second "county" supervisor, and towns having over two hundred thousand of population would elect a third supervisor. No town would have less than one vote, no supervisor more than ten votes; supervisors from the same town would share the votes equally but odd votes would go to the town supervisor or, if there were three supervisors and two "odd" votes, then to the town supervisor and the "county" supervisor who polled the larger number of votes.

The third plan was the Lazer plan. It would provide twenty county supervisors elected in districts varying in 1960 size between 30,861 and 35,925. The districts would be made up from existing election districts and would cut across town lines. Shelter Island, Southold and Riverhead would share one supervisor and Southampton and Easthampton would share one supervisor.

The fourth plan was the Lundberg Plan A. It would continue the ten town supervisors and each would have one vote at County meetings. In addition, ten "county coordinators" in addition to a county executive would be elected at large in the county. The County co-ordinators would do all the legislative committee work and each would have a single vote in county meetings, the County Executive continuing, as now, to have a tie-breaking vote. The theory of Plan A is that no combination of supervisors' votes could prevail over the votes of county-wide representatives, and, presumptively, the large-town votes would be reinforced by large-town influence in the electoral selection of the county coordinators.

A Lundberg Plan B would have retained a county board of ten but would elect the members at large; the County Executive's tie-breaking vote and veto would continue as in the present charter. Membership on the county board would be made incompatible with holding town office.

Local Law Intro. No. 1 would continue the town supervisors as the membership of the county board and give each a vote equal to his town's census population divided by 10,000 except that no town supervisor should have less than one vote nor more than half the total votes of the board. Each supervisor would have one vote on selection of a presiding officer, presence of a quorum, rules of procedure and their amendment or repeal, and adjournment. The tie-breaking vote of the County Executive would be continued.

The Albertson plan would appear not to rectify but to perpetuate the malapportionment that now exists. The Klein plan, while it would add certain "county" supervisors, in effect, gives to the supervisors, town and county, votes equal to each 10,000 of population or weighted voting.

■ It is not for the courts to decree the kind of legislative body which should govern the people of Suffolk County. The courts' function should be limited to guaranteeing to the voters that the vote of their representative will be as nearly equal to that of every other voter as may be possible. Although the current trend in reapportionment has been in the direction of mere numerical equality, there well may be other factors of importance to be considered. Thus, in a county in which the town has been the unit for over 200 years, there may be good and sufficient reasons for the preservation of these units. Consistent with such preservation might be the superimposition of a legislative body for the county, quite apart from the towns. New supervisory districts might seem preferable to the voters as an equalization measure. In any party system of government, selection of candidates will be a factor. To date the Town Supervisor plays two roles, one as Chief Executive of the Town, the other as a member of the County Board. Proper representation may call for his presence on the County Board to speak for his Town but his right to speak for his Town should not carry with it a widely disproportionate voting power. Under present laws both Town and County governing bodies have specified powers. To the extent that these County-wide functions affect every resident of the County, they should be exercised by a body elected on a basis as nearly equal as possible.

■ The court is not unmindful of the unique situation which has developed in the County over the last decade or an even longer period. The extraordinary population increase and the urbanization of the western part of the County have created the problem now before us. The population figures with respect to the towns of the eastern section of the County attest to no such expansion as yet. In short the court can take judicial notice of the present character of the County as being urban and industrial in the western portion and rural and agricultural in the eastern. Insofar as these differences affect the towns themselves, the town governments must, and undoubtedly will, deal with them as they

and their local constituents desire. The problem now before us relates only to the over-all County functions and the County legislative body to legislate as to them. As previously mentioned, in the selection of this body there well may be considerations other than mere numerical equality although this must be accepted as the primary factor from which a radical departure would lead to a court rejection as unconstitutional.

This outline of the problems as they appear to the court and of the action taken thus far is intended as a background for decision. It is obvious to the court that there must be a change in the voting power of each of the present County supervisors so as to give to the voter more equal representation in his vote. The Committee on Re-Apportionment has shown by its conscientious endeavors in the debating and drafting of the several plans mentioned a genuine awareness of the problems facing them. "It must be recognized that officials committed with the responsibility of devising a proper method of apportionment are operating in a very difficult and rather novel field of the law, * * *." Shilbury v. Board of Supervisors, Sullivan County, 46 Misc.2d 837, 842–843, 260 N.Y.S.2d 931, 937, (1965), aff'd App.Div., 267 N.Y.S.2d 1022 (1966).

During the many months of deliberation, the Board has been mindful of the various methods suggested for a solution, both because of the presence of Board members on the Committee and the actual presentation to it of the four plans. As the Board is now constituted, its voting power is not truly representative of the voter of the County at large. The adoption of any plan or plans and the submission thereof to the voters at the next (November 1966) election by the Board on the present basis of one vote per town would be tainted with the infirmity of the existing malapportionment. In taking such action as to a plan for proper representation, the present Board should speak for the County. The court does not imply that each individual member of the Board has not given his best judgment in his vote on County-wide matters, but the fact remains that the single vote of the representative of 1,300 voters and the same single vote of the representative of 170,000 voters is not equal voter representation. Therefore, to give to the County at once, because immediate action is imperative, representation by its presently constituted Board in the formulation and submission to the voters of a plan or plans, the voting power of each member of the Board must be adjusted so as better to speak for the residents of their respective towns.

The federal courts will do well in dealing with such local matters as are thrust upon them to be guided by, and to give due deference to, the decisions of the State courts dealing with similar problems. Fortunately, there have been many such decisions by the courts of New York. In these cases the form of the judgment or decree in substance has been to direct the Boards of Supervisors to adopt a legal, valid and constitutionally acceptable plan which will enable the voters at the next election, at which supervisors or a corresponding legislative body would be elected, to elect their county representatives.

In Seaman v. Fedourich, 47 Misc.2d 26, 262 N.Y.S.2d 591 (1965), on remand after the decision by the New York Court of Appeals, 16 N.Y.2d 94, 262 N.Y.S.2d 444, 209 N.E.2d 778 (1965), the Common Council of Binghamton was directed to "adopt and submit to this court for approval a districting plan, which, in good faith, is intended to meet constitutional requirements of equal representation;" (p. 29, 262 N.Y.S.2d p. 594). In both the Binghamton and the Sullivan County (Shilbury, supra) cases, to use two for illustrative purposes, the courts decreed weighted voting by the present Boards of Supervisors "as a stop-gap or temporary measure" to "redress disparities" (Shilbury) until a permanent plan became effective.

Although there are differences of opinion as to the practical advisabili-

ty and the legality of weighted voting, it has the merit that it can be made effective at once and if recognized as a temporary stopgap will give to the voter only that qualitative protection to which he is entitled. However, the New York courts have stressed weighted voting as a "temporary" expedient to be used until a permanent plan is adopted. Doubt as to weighted voting was expressed in W M C A, Inc. v. Lomenzo, 238 F.Supp. 916 (S.D.N.Y.1965). Furthermore, there may be a real question as to whether the concentration of votes in one or more supervisors does more than create a monolithic voting power, which might be avoided by employing other means that would equate population with representation, such as, for example, districting a town for electoral purposes or invoking proportional representation.

This court recognizes that the terms valid, legal or constitutionally acceptable cannot take on such a character until some court of last resort has conferred this status upon them. Witness the situation in Lucas v. Forty-Fourth General Assembly of State of Colo., 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964). The direction to submit a plan or plans to this Court for approval may not be an ending but at least it will be a beginning. In final analysis (subject to conformity with constitutional requirements, see *Lucas*, supra), the people of the County should have the right to express their preference as to the legislative body which is to govern their county. However, for the present, it is sufficient to conform the voting strength of the Board members to the population represented. The most arithmetical method would be to give each Board member a vote equalling that fraction obtained from a numerator of his Town's, and a denominator of the County's, total population using the 1960

federal census. Since a weighted vote is to be only a stopgap until a permanent plan is formulated, approved and adopted, an assignment to each supervisor of a number of votes equal to the number, to the nearest whole number, obtained by dividing the population of his Town (1960 federal census) by 5,000, providing that no supervisor shall have less than one vote, should serve better to equalize the voting strength of the various areas of the County.

A time schedule is important. The discussions during the past many months have undoubtedly enabled the pros and cons of the various plans proposed to be considered. There must ultimately be a time for decision. Therefore, from and after the filing of this opinion the votes of the present Board shall be counted as herein indicated continuing in this manner until a permanent plan shall have been adopted. On or before July 11, 1966, the Board shall present a plan to this court, copies thereof to be served on all parties to the proceeding, which the Board proposes to adopt as an amendment of the Suffolk County Charter acting within the powers conferred upon the Board therein and for submission to the electorate of the County at the November 1966 election; or, in the event that the Board wishes to present two or more plans to the electorate at said election, such plans shall be so submitted. Objections to any plan or plans so submitted may be filed with this court on or before July 18, 1966.

An order consistent with this opinion is being entered forthwith and this Court will retain jurisdiction of the proceedings, both to review the plan or plans submitted and for such further relief as may become necessary or appropriate in connection with the implementation of this order.