22

[599 NYS2d 930]

In the Matter of BROOKLYN HEIGHTS ASSOCIATION, INC., et al., Respondents, v FRANK J. MACCHIAROLA et al., as Members of the New York City Districting Commission, et al., Appellants.

Second Department, June 21, 1993

## APPEARANCES OF COUNSEL

*O. Peter Sherwood, Corporation Counsel* of New York City *(Joel Berger* and *Fred Kolikoff* of counsel), for appellants.

*Cravath, Swaine & Moore,* New York City *(Francis P. Barron, Matthew A. Reiber* and *David M. Kroeger* of counsel), for respondents.

*Wolfson & Carroll,* New York City *(John W. Carroll* of counsel), for city council member Joan Griffin McCabe, *amicus curiae.*

## OPINION OF THE COURT

COPERTINO, J.

The question before us is whether the New York City Districting Commission violated the requirements of the New York City Charter in promulgating a redistricting plan with respect to Districts 33, 38, and 1, by failing to satisfy the mandate that "[d]istrict lines shall keep intact neighborhoods and communities with established ties of common interest and association". (NY City Charter § 52 [1] [c].) This question must be answered in the affirmative.

In the November 1989 election, the people of the City of New York approved a new City Charter, which provided for an expanded City Council of 51 members *(see,* NY City Charter § 22). In order to create new City Council districts, the Charter established a Districting Commission (hereinafter the Commission) which was to complete its task before the 1991 general election *(see,* NY City Charter §§ 50, 51, 1152 [d] [11]). Under New York City Charter § 52, the Commission was given several criteria for creating districts. Those criteria are as follows:

"1. In the preparation of its plan for dividing the city into districts for the election of council members, the commission shall apply the criteria set forth in the following paragraphs to the maximum extent practicable. *The following paragraphs shall be applied and given priority in the order in which they are listed.*

"a. The difference in population between the least populous and the most populous districts shall not exceed ten percentum (10%) of the average population for all districts, according to figures available from the most recent decennial census. Any such differences in population must be justified by the other criteria set forth in this section.

"b. Such districting plan shall be established in a manner that ensures the fair and effective representation of the racial and language minority groups in New York city which are protected by the United States voting rights act of nineteen hundred sixty-five, as amended.

"c. *District lines shall keep intact neighborhoods and communities with established ties of common interest and association, whether historical, racial, economic, ethnic, religious or other.*

"d. Each district shall be compact and shall be no more than twice as long as it is wide.

"e. A district shall not cross borough or county boundaries.

"f. Districts shall not be drawn for the purpose of separating geographic concentrations of voters enrolled in the same political party into two or more districts in order to diminish the effective representation of such voters.

"g. The districting plan shall be established in a manner that minimizes the sum of the length of the boundaries of all of the districts included in the plan.

"2. Each district shall be contiguous, and whenever a part of a district is separated from the rest of the district by a body of water, there shall be a connection by a bridge, a tunnel, a tramway or by regular ferry service.

"3. If any district includes territory in two boroughs, then no other district may also include territory from the same two boroughs" (NY City Charter § 52; emphasis supplied).

In creating District 38 in Brooklyn, the Commission was desirous of creating a district with a majority of "Latinos" centered in the Red Hook and Sunset Park neighborhoods in order to satisfy New York City Charter § 52 (1) (b), requiring

"the fair and effective representation of the racial and language minority groups in New York city". However, there was an insufficient number of Latinos in the Sunset Park and Red Hook areas to form a majority. There was an additional group of Latinos in a nearby neighborhood, which if annexed to the Sunset Park and Red Hook areas, would make the Latinos a majority, but it was not contiguous with the Sunset Park and Red Hook areas as required by New York City Charter § 52 (2). The Commission therefore created a land bridge between the two communities in order to satisfy both criteria (NY City Charter § 52 [1] [b]; [2]).

The land bridge consisted primarily of census tabulation block 105, which runs along the Brooklyn waterfront from the Brooklyn Battery Tunnel to Old Fulton Street. Following a policy of not splitting census blocks, the Commission annexed all of census tabulation block 105 to District 38.

In addition, there are six Port Authority piers attached to the Brooklyn waterfront in the northern part of census tabulation block 105 (hereinafter Piers 1 to 6). Rather than include these piers in the newly created District 38, or for that matter in any Brooklyn district, the Commission placed them in District 1 in Manhattan. The Commission's stated reason for placing the piers in Manhattan was a "technical matter". The Commission stated that it did not discuss the matter of the piers, or consider the option of locating the piers in Brooklyn. The Commission stated that since the piers were actually part of New York County (see, Administrative Code of City of NY § 2-202 [1], [3]), the computer which drew the district lines, absent instructions to do otherwise, simply followed county boundaries.

The petitioners, a group of Brooklyn Heights residents and civic organizations, commenced this CPLR article 78 proceeding challenging the district lines claiming that a portion of census tabulation block 105 and Piers 1 to 6 were part of their neighborhood, and that by failing to include these two areas in District 33, the Commission violated New York City Charter § 52 (1) (c) by failing to keep their neighborhood intact. The Supreme Court found that the Commission's decision not to split census tabulation block 105 was arbitrary and capricious.

■ Under New York City Charter § 52 (1), the Commission was required to apply several criteria to the maximum extent possible and give preference according to the order in which

those criteria were listed. The third criterion under New York City Charter § 52 (1) is to keep neighborhoods intact. The petitioners' proof clearly established that the relevant portion of census tabulation block 105 has historically been considered a part of the Brooklyn Heights neighborhood. They further demonstrated their present effort to develop the waterfront and piers into useful public space, to which thousands of volunteer hours and dollars have already been devoted. Since the splitting of census tabulation block 105 would not have hampered the Commission's desire to create a Latino district, or violated any of the other districting criteria, the Commission failed to implement New York City Charter § 52 (1) (c) to the maximum extent possible (see, *Broad Channel Civic Associations. v New York City Districting Commn.*, Sup Ct, NY County, Aug. 15, 1991, Evans, J., index No. 18756/91).

■ Our dissenting colleagues, relying on *Matter of Wolpoff v Cuomo* (80 NY2d 70), urge that we must nevertheless uphold the Commission's decision because the petitioners failed to establish " 'beyond reasonable doubt' " that the subject area was part of the Brooklyn Heights neighborhood in 1990. However, this strict standard of review is not appropriate here. The petitioners are not making a constitutional challenge to a legislatively enacted statutory redistricting scheme, nor do they argue that the plan does not "substantially comply" with the mandates of the Federal or State Constitutions. Nor do they contend that there was anything improper about the Commission's decision to use census tabulation block 105 to form a contiguous Latino-majority district under the City Charter. They claim only that the incidental determination of the Commission in refusing to split block 105 was unnecessary to the creation or maintenance of any other district, and violated an interest in keeping neighborhoods intact, which interest is recognized in the City Charter.

■ We also reject as unpersuasive the Commission's argument that it was not permitted to split census tabulation blocks based on the Charter's provision that it: "shall utilize the final count results of the [1990] census" (NY City Charter § 1152 [d] [11] [b]). The stated provision makes no mention of census tabulation blocks. Inasmuch as the Charter is clear that the criteria to be followed were those contained in New York City Charter § 52, any interpretation by the Commission of New York City Charter § 1152 (d) (11) (b) must be secondary to interpretation of the former criteria. Further, we disagree with the dissenters' contention that pursuant to case

law, census blocks are inviolate absent further involvement of the Federal Bureau of the Census. Certainly, redistricting must be founded on Federal census figures *(Seaman v Fedourich,* 16 NY2d 94, 104). We do not dispute the fact that keeping census tabulation blocks intact is preferable when district voting lines are drawn, but that is because they are the smallest geographic unit used by the Federal Bureau of the Census and, as a result, splitting them can result in the use of unacceptable estimates by those charged with drawing district lines *(see, Seaman v Fedourich, supra; Chonigman v County of Westchester,* 192 AD2d 499). Thus, the underlying mandate is the use of reliable population figures as established by the Federal census, not maintaining the integrity of the blocks qua blocks *(see also, Honig v Rensselaer County Legislature,* 37 AD2d 658, *affd* 29 NY2d 630; *Thayer v Garraghan,* 28 AD2d 584, 29 AD2d 825, *affd* 21 NY2d 881).

In the present case the 1990 Federal census reported a total of 47 people in census tabulation block 105, which is the only block involved in this proceeding. Consequently, splitting this census tabulation block could result in a deviation of population equality from one district to another of no more than those 47 persons. It has been clearly recognized that minor deviations—defined generally as those under 10%—are permissible if necessary to allow government to pursue other legitimate objectives *(Brown v Thomson,* 462 US 835, 842). It cannot seriously be argued that a potential variance resulting from splitting census tabulation block 105 will be anything but de minimis, nor can it be asserted that the City Charter mandate of preserving neighborhood integrity is not the sort of "legitimate objective" envisioned by the United States Supreme Court. Accordingly, we conclude that under the facts of this case the decision not to split census tabulation block 105 served no real purpose and did not implicate the concerns underlying the general policy of not splitting census blocks *(see also, Abate v Mundt,* 25 NY2d 309, *affd* 403 US 182). This case is thus distinguishable from *Chonigman v County of Westchester (supra).* There, the County of Westchester estimated population in more than just a single block in drawing legislative districts and, more importantly, the Federal census figures themselves were not advanced as clear proof that the impact of splitting a census block would be absolutely minimal.

■ We also agree with the Supreme Court that the Commis-

sion's placement of Port Authority Piers 1 to 6 in Manhattan District 1, rather than District 33, was arbitrary and capricious. As mentioned, the Commission's sole justification for placing the piers in a Manhattan district was simply to follow county boundaries. The petitioners introduced proof that piers jutting into the East River have historically been considered part of the Brooklyn Heights neighborhood. While the record contains some contrary historical evidence regarding the connection of the piers to Manhattan—specifically, that the geographic boundary between New York and Kings County has been defined as the "low-water mark on the shore of Long Island" (Administrative Code § 2-202 [1], [3]; *but see, Udall v Trustees of Brooklyn,* 19 Johns 175; *Stryker v Mayor of City of N. Y.,* 19 Johns 179)—we find that this proof had little to do with the work of the Commission. As is indicated by the Commission's statement regarding its reason for placing the piers in District 1, this particular county boundary was accorded no sociological, political, or economic significance in the redistricting process. Thus, in giving more weight to the preservation of county boundaries than to keeping a Brooklyn neighborhood intact, the Commission failed to give the City Charter criteria the proper priority *(see,* NY City Charter § 52 [1]).

Since the Commission is no longer in existence, we do not believe that remanding this matter to the Commission is warranted *(cf., Matter of Association of Secretaries v Office of Ct. Admin.,* 75 NY2d 460, 475-477; *Incorporated Vil. of Great Neck Plaza v Nassau County Rent Guidelines Bd.,* 60 AD2d 593, 594; *Burke's Auto Body v Ameruso,* 113 AD2d 198, 200-201). Moreover, we agree with the Supreme Court that section 5 of the Voting Rights Act of 1965 (42 USC § 1973c) does not require preclearance of the court-ordered changes in the district lines. State courts have the power to decide, as a collateral matter, whether section 5 applies to contemplated changes in election procedures *(see, Hathorn v Lovorn,* 457 US 255), and we agree with the Supreme Court that since the disputed area is virtually unpopulated, no voting rights would be affected.

In view of the foregoing, the judgment appealed from is affirmed.

SULLIVAN, J. P. (dissenting). As the majority has stated, this appeal follows a proceeding wherein one Justice of the Supreme Court modified the plan of the 15-member, nonpartisan

Districting Commission insofar as Districts 1, 33 and 38 are concerned. Since I believe that the action of the Supreme Court was unwarranted and based upon an improper analysis of the facts and the law, I dissent.

At the outset, it is important to know exactly what area is involved in these proceedings: it is Furman Street from Atlantic Avenue to the Brooklyn Bridge and west including the upland areas of Piers 1 through 6 and those piers themselves. Furman Street runs along the base of the Brooklyn-Queens Expressway (hereinafter the BQE). In that area, the BQE is layered and on top is the Promenade. This lowland area consists of warehouses, some industrial facilities and the pier sheds of a now defunct shipping industry. This is the area which the petitioners, two associations and several individual residents of up-scale residential communities, claim is an integral part of their "neighborhood" and could not be separated from them pursuant to the mandate of the New York City Charter (NY City Charter § 52 [1] [c]).

There is no question but that the primary obligations of the Districting Commission in establishing a plan for the enlarged number of council districts were to create districts that were substantially equal in population (NY City Charter § 52 [1] [a]) and to ensure fair and effective representation of those racial and language minority groups in New York City which are protected by the United States Voting Rights Act of 1965, as amended (NY City Charter § 52 [1] [b]). In order for the plan to be effective, nine or more Commissioners had to sign a certificate setting forth the manner in which the Commission implemented these requirements as to protected minorities (NY City Charter § 51 [g]; § 1152 [d] [11]). Eleven members of the Districting Commission signed such a certificate on June 7, 1991, and on the same date filed the plan and certificate with the City Clerk.

There is also no question but that the Districting Commission was to base its plan on conditions as they existed in 1990 as revealed in the 1990 Federal census. This is the explicit command of New York City Charter § 1152 (d) (11) (b). The Commission was mandated to prepare a plan, hold hearings, revise the plan, hold hearings on the revised plan, and to adopt a final plan within the two-month period from April to June 7, 1991 (NY City Charter § 1152 [d] [11] [j]). Conditions that existed in earlier years were irrelevant, as was population information from any other source.

The composition of the Districting Commission itself was prescribed with great care. Eight of the 15 members were named by the members of the City Council; five by members of the majority party (NY City Charter § 50 [a] [1]), and three by members of the second largest party (NY City Charter § 50 [a] [2]). The remaining seven members were appointed by the Mayor; however, his appointees were not to create a majority in any party (NY City Charter § 50 [a] [4]). In addition, the Commission had to have at least one resident from each borough of the City (NY City Charter § 50 [b] [1] [a]) and most importantly, the Commission had to have members from those racial and language minority groups protected by the Voting Rights Act of 1965, as amended, in proportion to their population in the City (NY City Charter § 50 [b] [1] [b]). In short, this Commission was a far truer microcosm of the City, politically and ethnically, than was the existing City Council or any other legislative body.

At the outset we must examine the standard of judicial review of districting proposals. Recently, the Court of Appeals set forth the standard in *Matter of Wolpoff v Cuomo* (80 NY2d 70). In *Wolpoff* the courts were asked to strike down the laws (L 1992, chs 76, 77, 78) enacting a redistricting plan for the Senate and the Assembly. Specifically, it was claimed that the plan for redistricting the Senate violated NY Constitution, article III, § 4 mandating county integrity in devising senatorial districts. It was conceded that the proposed plan did in fact violate that section of the State Constitution. Nonetheless, the Court upheld the redistricting plan, noting that the Legislature, like the Districting Commission in this case, had to draw the lines in conformity with Federal constitutional and statutory requirements. Under such circumstances, the Court stated: "The test is whether the Legislature has 'unduly departed' from the State Constitution's requirements regarding contiguity, compactness and integrity of counties *(Matter of Schneider v Rockefeller,* 31 NY2d 420, 429) in its compliance with Federal mandates. '[I]t is not our function to determine whether a plan can be worked out that is superior to that set up by [the Legislature]. Our duty is, rather, to determine whether the legislative plan *substantially complies* with the Federal and State Constitutions' *(id.,* at 427). A strong presumption of constitutionality attaches to the redistricting plan and we will upset the balance struck by the Legislature and declare the plan unconstitutional ' "only when it can be shown *beyond reasonable doubt* that it conflicts

with the fundamental law, and that until every reasonable mode of reconciliation of the statute with the Constitution has been resorted to, and reconciliation has been found impossible" ' *(Matter of Fay,* 291 NY 198, 207)" *(Matter of Wolpoff v Cuomo,* 80 NY2d 70, 78 [emphasis supplied]).

With this standard in mind, I turn now to the analysis of this case. Contrary to the majority and the Supreme Court Justice who decided this matter initially, I do not find that the plan for District 33 violates the requirements of New York City Charter § 52 (1) (c). Simply put, I do not think that the petitioners established beyond reasonable doubt that the remote historical ties between Furman Street and the areas west to the bulkhead line and the neighborhood of Brooklyn Heights were sufficient to outweigh the fact that the two areas have been physically separated for nearly 40 years. While the anecdotal evidence contained in the affidavits of neighborhood residents that George Washington retreated from what is now Furman Street, or that in the 1880s shipowners who lived in Brooklyn Heights had tunnels running down to their piers, are interesting bits of history, they have little relevance to the area today.

There is no question but that the building of the Brooklyn-Queens Expressway, completed in the 1950s, effectively separated the piers and industrial lowlands from the residential area on the bluffs that gave Brooklyn Heights its name. No one today can sleigh ride down Montague Street and the Penny Bridge is long gone. Since the BQE, Brooklyn Heights has ended at the Promenade. In 1965, the New York City Landmarks Commission, recognizing Brooklyn Heights as a *residential area* of architectural significance, established the Brooklyn Heights Historic District. The western boundary of the district is "the Brooklyn-Queens Connecting Highway". In short, the contested area, i.e. Furman Street and the land west of it, were not part of Brooklyn Heights in 1990. Clearly the petitioners did not establish a violation of New York City Charter § 52 (1) (c).

Turning to the contention that the Commission was arbitrary and capricious in declining to split census tabulation block 105, I find it to be totally devoid of merit. This is the nub of the decision of the trial court and the majority. I find it lacking in precedential support or logic.

There is no doubt that the Commission had to perform its complex and difficult task of redistricting the City of New

York on the basis of the Federal census returns. In *Seaman v Fedourich* (16 NY2d 94, 104), Judge Fuld stated: "as it relates to *local* apportionment or districting, *the declared policy is readily apparent and reason dictates that the most recent official census be employed in this area as well*" (emphasis supplied).

The strength of this policy was recognized by the Charter provision setting up the Commission and its mandate. New York City Charter § 1152 (d) (11) (b) required the redistricting plan to be based on the results of the 1990 Federal census as delivered to the Governor by April 1, 1991. This census information for the City of New York was provided in 33,559 census tabulation blocks. As the majority recognizes, these census tabulation blocks are the smallest geographic unit used by the Federal Bureau of the Census and hence the building blocks the Commission had to use in creating its plan.

In other cases involving redistricting of counties and cities, the courts have been steadfast in rejecting plans that disregarded or split geographic units used by the Federal Bureau of the Census (*see, Thayer v Garraghan,* 28 AD2d 584, 29 AD2d 825, *affd* 21 NY2d 881; *Honig v Rensselaer County Legislature,* 37 AD2d 658, *affd* 29 NY2d 630; *Chonigman v County of Westchester,* 192 AD2d 499). It is true that in *Thayer v Garraghan (hereinafter Thayer II]* 29 AD2d 825, *affd* 21 NY2d 881, *supra),* the courts approved a plan redistricting the Common Council of the City of Kingston based upon split enumeration districts *where the Bureau of the Census itself adjusted the population figures between the parts of the enumeration districts.* Clearly that is not the case here. Furthermore, in *Thayer II (supra),* it was held that the City could base its plan on any formulation of the 1960 census figures made available by the Bureau of the Census not just those duly certified by the Bureau. In this case, however, the Commission was limited to the census results as delivered to the Governor by April 1, 1991 (NY City Charter § 1152 [d] [11] [b]). Thus, it appears that the option of splitting census enumeration blocks with the assistance of the Bureau of the Census was not legally available to the Commission.

Given the clear line of cases mandating the use of Federal census data as supplied by the Bureau of the Census (in census enumeration blocks) and permitting the splitting of those blocks only when the population estimates have been verified by the Bureau of the Census, and given that the

entire plan had to be completed in slightly more than two months, how can it be said that the Commission's decision not to split census enumeration blocks was arbitrary or capricious? Over the span of 25 years, a clear State policy has evolved: in redistricting, a plan must be based on Federal census enumeration blocks and nothing less unless the Bureau of the Census verifies the population in some way. This is the policy the Commission adopted, and which the majority now says is arbitrary and capricious. It is the same policy adopted by this Court *(Chonigman v County of Westchester, supra)*, the Appellate Division, Third Department *(Thayer v Garraghan, 28 AD2d 584, supra; Honig v Rensselaer County Legislature, supra)* and the Court of Appeals *(Seaman v Fedourich, supra; Thayer v Garraghan, 21 NY2d 881, supra; Honig v Rensselaer County Legislature, 29 NY2d 630, supra)*, yet the majority says it was arbitrary and capricious for the Commission to adopt it. Not only do I find this reasoning less than compelling, I am baffled at its application so as to achieve a dubious result, the unification of a virtually abandoned industrial/shipping area with an upscale residential community that has been physically separated from it for 40 years. The decision of the Commission " 'is to be accepted by the courts "if it has 'warrant in the record' and a reasonable basis in law" * * *. "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body" *(Rochester Tel. Corp. v U. S.,* 307 U. S. 125, 146)' " *(Matter of Howard v Wyman,* 28 NY2d 434, 438).

For all of the reasons stated above, I believe the determination of the trial court was in error and the judgment should be reversed and the proceeding dismissed.

O'BRIEN and PIZZUTO, JJ., concur with COPERTINO, J.; SULLIVAN, J. P., dissents in a separate opinion in which BALLETTA, J., concurs.

Ordered that the judgment is affirmed, with costs.