Saul Steeit, J.
Pursuant to CPLB. 3212, plaintiff moves for summary judgment and judgment on the pleadings in his favor *1014 restraining defendants, as members of the Board of Estimate of the City of New York, from passing upon and approving, disapproving or changing proposed budgets of the City of New York, and from exercising any other alleged legislative powers.
The material facts are not in dispute. There is no issue regarding the allegations of plaintiff’s complaint as to the great disparity in population among the five boroughs of the City of New York, nor do defendants deny that despite such variation, the City Charter gives each borough the same vote in the Board of Estimate (see New York City Charter, §§ 61, 62).
It is plaintiff’s contention, however, that sections 119,120,121, 124, 128, 221, 222, 223 and 224 of the New York City Charter, all of which relate to city budget and allied fiscal matters, violate the Constitution of the United States. He asserts that these provisions confer upon the Board of Estimate (hereinafter referred to as the “ Board ”) the' power to participate in the adoption of expense budgets and capital budgets and thereby deny to each citizen and voter in this city an equal vote, “ora vote as nearly equal as possible to the vote of every other voter and citizen in the city ”.
Thus, in substance, while plaintiff, significantly, does not seek “ weighted ” voting by members of the Board or to set aside the method by which these members are elected (i.e., reapportionment), he, in effect, merely argues that the “ one man— one vote ” rule recently enunciated by the Supreme Court of the United States is applicable to the voting process of the Board on city budget matters, thereby nullifying the above-enumerated provisions of the charter (citing Avery v. Midland County, 390 U. S. 474 [1968]). In my opinion such contentions and the resulting 11 back door ’ ’ effort by plaintiff to alter or amend the Charter of the City of New York are without merit.
It is now well-settled law, even under the Avery decision cited and relied on by plaintiff, that the “ one man — one vote ” principle established by the much publicized ‘ ‘ reapportionment cases ” applies only to Legislatures or the “ general governing body ” of a local government unit (Avery v. Midland County, supra, pp. 476, 485; see, also, WMCA v. Lomenso, 377 U. S. 633; Reynolds v. Sims, 377 U. S. 533; Maryland Committee v. Tawes, 377 U. S. 656; Davis v. Mann, 377 U. S. 678; Roman v. Sincock, 377 U. S. 695; Lucas v. Colorado Gen. Assembly, 377 U. S. 713; Wesberry v. Sanders, 376 U. S. 1; Iannucci v. Board of Supervisors of County of Washington, 20 N Y 2d 244; Seaman v. Fedourich, 16 N Y 2d 94).
However, contrary to plaintiff’s contention, an analysis of the background, history and function of the Board, as herein *1015 after set forth in detail, clearly establishes that the subject rule does not apply to the Board today, inasmuch as it is now neither a “ Legislature ” nor the “ general governing body” of the City of New York, nor is it a political unit vested with “ general governmental powers ” (Avery v. Midland County, supra, pp. 485-486).
Significantly, this is in sharp contrast to county Boards of Supervisors outside the City of New York which, by mandate of law, have the responsibility and powers of a legislative body in the enactment of local laws (County Law, § 301). Thus, the “ one man — one vote ” rule has consistently been held applicable to such bodies (see Iannucci v. Board of Supervisors, supra; Davis v. Board of Supervisors of County of Clinton, 28 A D 2d 583; Graham v. Board of Supervisors of Erie County, 27 A D 2d 902; Glessing v. State of New York, 27 A D 2d 977; see, also, Saratogian, Inc. v. Board of Supervisors of County of Saratoga, 20 N Y 2d 244; Augostini v. Lasky, 46 Misc 2d 1058; Morris v. Board of Supervisors of Herkimer County, 50 Misc 2d 929; Orlando v. Board of Supervisors of Genesee County, 53 Misc 2d 377).
Unlike these county boards of supervisors, however, in New York City, the Board is not authorized nor does it have any serious legislative role in the enactment of the city’s local laws. This power is vested in the Mayor and the City Council (New York City Charter, §§ 21, 27 and 38). iC'oncededly, similar to such other bodies as the Board of Health and the Public Service Commission, the Board has a specified but strictly limited range of powers concerning the approval and adoption of certain fiscal policies (infra). Nevertheless, the major part of the legislative and governmental powers of the city lie elsewhere (New York City Charter, § 8, subd. a; §§ 21, 27 and 38). It is this critical division of legislative duties which distinguishes the Board from the legislative body considered by the Supreme Court of the United States in the decision cited and relied on by plaintiff (Avery v. Midland County, supra).
An examination of the Avery decision clearly shows that under the Constitution of the State of Texas, virtually all of the county’s powers were vested in the “ Commissioners Court ”, the subject body of the lawsuit. As noted by Mr. Justice White, writing for the majority of the court, the Commissioners Court “is the general governing body of the county”. (390 U. S. 474, 476; emphasis added.)
In apposition thereto, however, the chief functions today of the Board in this city (as fully set forth in the uncontroverted answering affidavit of Ruth W. Whaley, its Secretary and Parlia *1016 mentarían, and the exhibits annexed thereto), are merely, in effect, to be the caretaker of the city’s property and to act. as Trustee of the New York City Employees’ Retirement System. Admittedly, however, until the 1963 revision of the City Charter, the Board did exercise far greater legislative powers than it has today and perhaps, until then, would have lent substance to plaintiff’s alleged grievance (see McGoldrick, J., “ The Board of Estimate and Apportionment of New York City ’ ’ 18 Nat. Mun. Rev. 125 [1929]; Interim Report, N. Y. St. Comm. on the Governmental Operations of City of N. Y. [Moore Comm.]; Kaufman, W., “ The New York City Board of Estimate ”). An analysis of the development and changes in the powers and duties of the Board, therefore, is necessary and pertinent to the issues here involved.
The Board has its origin in the 1864 legislative creation of the “ Board of Estimate and Apportionment ”, consisting of the Commissioners of the Metropolitan Police and the Comptrollers of the Cities of New York and Brooklyn. It was charged with estimating the expenses of this district and apportioning them among the cities, counties, towns and villages. The immediate predecessor of the present Board was instituted under the influence of the infamous Tweed Ring (in 1871) and was charged with fixing a tax rate and apportioning revenue among the city and county departments. The 1873 charter reform delegated similar budgetary and fiscal duties to the Board of Estimate and Apportionment but in 1882, the New York City Consolidation Act added such other duties as fixing salaries, establishing various city employees’ lists and approving contracts for street-sweeping and garbage collection.
Greater New York emerged with the adoption of the 1898 Charter. Then, 1901 witnessed the beginning of a significant shift of power to the Board of Estimate and Apportionment which, under the revised charter of that year, gave this Board the membership it still, in substance, retains, namely, the Mayor, the Comptroller, the President of the then new Board of Aider-men and the five Borough Presidents (Greater New York Charter § 226; L. 1901, ch. 466). The effect of this was to weaken, in large measure, the prior great influence of the Mayor, since his appointees no longer served on the Board (see Mayor’s Messages, 1898-1902 [Mayor Robert Van Wyck]). City-wide officers had three votes each, Manhattan and Brooklyn Borough Presidents had two votes each, and the remaining Borough Presidents, one vote each. Under the revised charter of 1901, the Board was charged with preparing the annual budget, including the terms and conditions for expenditures. This, *1017 became a major source of the Board’s power, particularly as the Aldermen could only decrease but not increase the budget (“ The Board of Estimate and Apportionment of New York City ”, supra).
From 1901 on, the Board continued to grow in power and prestige. Control over franchises and streets was added to its duties in 1905. In 1911, the Board was given the power to pass on improvements and to levy assessments therefor. In 1916, it was empowered to adopt zoning regulations and in 1920, the Board was made Trustee of the City Employees’ Retirement System.
De jure recognition of the status of the Board was given in 1924 when, under the new City Home Rule Law, it was constituted as the upper house of the municipal Legislature, with the Board of Aldermen as the lower house (L. 1924, ch. 363). By 1932, the Joint Legislative Committee to Investigate the Affairs of the City of New York, speaking of the Board, had cause to note: “ The Board of Estimate and Apportionment has been increasing in power and prestige even more rapidly than the Board of Aldermen has been sinking in usefulness and public esteem. Today, it is essentially the governing body of the city combining within itself policy-forming and legislative functions, for although some of these, it is true, must be shared with the aldermen, their concurrence therein has very nearly become pro forma, and, indeed, in a number of matters their concurrence is obligatory ” (emphasis added; Report of the Joint Legislative Committee to Investigate the Affairs of the City of New York [Dec. 28, 1932], p. 11).
As a result of this legislative investigation and by the provisions of the subsequent 1938 City Charter proposed by the “ Thacher Commission ”, the increasing legislative powers of the Board were brought to an abrupt halt. Thus, the Municipal Assembly was abolished and a unicameral Legislature, namely, the City Council, was created. Nevertheless, under the “ Thacher Charter ”, the Board’s power over the city budget still exceeded that of the Council and its approval was still required for local laws having to do with certain subjects directly related to (1) the organization. and the administration of the city government and (2) amendments to the City Charter (New York City Charter, 1938, § 39). Likewise, this Charter also vested in the Board the city’s “Residual Powers” (§ 70). It is noteworthy that this section was held not to be a grant of legislative power (see Matter of Natilson v. Hodson, 264 App. Div. 384, affd. 289 N. Y. 842).
*1018 In 1961, the New York State Commission on Governmental Operations of the City of New York (the Moore Commission) urged that complete legislative power be vested in the City Council. The resulting adoption of the 1961 Charter, therefore, for the first time, constituted a reversal of the movement of power from the Council and the Mayor to the Board which began in 1901 (supra; Charter Rev. Comm. of City of N. Y., [Cahill Comm.], 1960 Report; New York City Charter, 1961). However, the changes made by the subsequent 1963 Charter regarding the powers of the Board were far more dramatic and are of particular significance to the pending controversy.
Under the provisions of the 1963 City Charter, the Board, in effect, was reduced, essentially, to the trustee, care-taking body it is today. The requirement of its consent to local legislation was eliminated. The “ Residual Powers ” of the city were taken from the Board and given to the Mayor (Charter, § 8, subd. a). The Mayor, rather than the Board, was given the power to initiate capital expenditures after the budget was adopted (Charter, § 228). Likewise, after the capital budget is adopted, the Mayor is now authorized to add up to 15% to the cost of any particular project.
Similarly, the Board now shares equally with the City Council the power to increase or decrease appropriations and, for the first time, a mayoral veto of any such change can be overridden only by a two-thirds vote of both bodies (§§ 120, 121). In addition, the new charter transferred most of the Board’s former control over personnel to the Mayor (§ 3; § 813, subd. [i] ; § 1102, subd. b).
Obviously, therefore, under the present charter, the Board today cannot reasonably be deemed to be a “ legislature ” or a “ general governing body ” within the intendment of the Avery decision (supra); nor, with the exception of its limited fiscal authority, as above noted, does the Board have any of the powers or functions of the Texas’ “Commissioners Court ” which required the application by the Supreme Court of the United States of the “ one man— one vote ” rule in the case relied on by plaintiff (supra).
Nevertheless, as noted by defendants in their memoranda in opposition to plaintiff’s application here, despite the distinction between the Board and the “ Commissioners Court ”, the comments of the Supreme Court in Avery are worthy of note. The court stated (supra, p. 485-486):
“ This Court is aware of the immense pressures facing units of local government, and of the greatly varying problems with which they must deal. The Constitution does not require that *1019 a uniform straitjachet bind citizens in devising mechanisms of local government suitable for local needs and efficient in solving local problems. * * *
“ The Sailors and Dusch eases [Sailors v. Board of Educ., 387 U. S. 105; Dusch v. Davis, 387 U. S. 112] demonstrate that the Constitution and this Court are not roadblocks in the path of innovation, experiment, and development among units of local government. * * * Our decision today is only that
the Constitution imposes one ground rule for the development of arrangements of local government: a requirement that units with general governmental poivers over an entire geographic area not be apportioned among single-member districts of substantially unequal population.” (Emphasis added; see, also, Iannucci v. Board of Supervisors of County of Washington, 20 N Y 2d 244, 250, supra.)
There can be no doubt that viable local governments need many innovations, numerous combinations of old and new devices and great flexibility in municipal arrangements in order to meet today’s serious and changing urban conditions (see Sailors v. Board of Educ., supra, pp. 109-110). Concededly, New York City’s Board, with its present makeup and special combination of powers (supra), is no longer an innovation or experiment. It is a highly successful organ of city government which, in effect, preserves our democratic system of rule and lawmaking since all of its members are elected public officials from all five boroughs who exercise only limited legislative functions. The power to govern the city generally and to make the laws therefor still remain in the popularly elected legislative body, namely, the City Council, and the Mayor (see County Securities v. Seacord, 278 N. Y. 34; see, also, New York City Charter, § 8, subd. a; §§ 21, 27 and 38).
I find, therefore, there is nothing in the Constitutions of the United States or the State of New York, or in any of the recent reapportionment edicts of the highest judicial tribunal of our country which bars any of the activities of the Board as it is presently composed. Nor do I find any requirement in law or otherwise to impose the ‘ ‘ one man — one vote ’ ’ principle upon a body such as the city’s Board of Estimate. If this were the law, as urged by plaintiff, it would appear that numerous other agencies such as the Public Service Commission, the State Tax Commission, and the New York City Board of Health would have to be elected from “ equal population ” districts, inasmuch as they perform certain duties which, in some manner, may properly be characterized as “ legislative ” (see County Securities v. Seacord, supra). Obviously, this result was not intended *1020 by any constitutional provision or by any judicial pronouncement, because such bodies, like the city’s Board here involved, are not “legislatures” or “general governing bodies ” but merely constitute ‘ ‘ special bodies ’ ’, created for and operating within a well-defined, narrow range.
The practice in the City of New York and elsewhere of delegating some legislative or quasi-legislative powers to various boards or agencies (whose members may not even be elected officials) must be held to be valid so long as the general legislative power, as here, remains in the popularly elected legislative body.
Accordingly, plaintiff’s application for injunctive relief is denied and summary judgment is granted in favor of defendants dismissing the complaint.