Fuchsberg, J.
(concurring). I concur in the result reached by the majority, but find its disposition of the issues in this case too summary. Binding arbitration statutes have been enacted by some 20 States and 10 cities (McAvoy, Binding Arbitration of Contract Terms: A New Approach to the Resolution of Disputes in the Public Sector, 72 Col L Rev 1192, 1192-1193). Courts in other States have struggled with these statutes, presenting as they do such an unusual exercise of the delegative powers of a Legislature. The results of their struggles have been mixed; a number of conflicting views as to the grounds on which compulsory arbitration statutes may be upheld have emerged (See Barr, Public Arbitration Panel as an Administrative Agency: Can Compulsory Interest Arbitration Be An Acceptable Dispute Resolution Method in the Public Sector?, 39 Albany L Rev 377).
Where a statute raises constitutional questions, involves serious community interests, and inherits conflicting and confused views from courts in other States, the basis upon which this court upholds it ought to be set forth in some detail. My own analysis therefore follows.
I
BACKGROUND OF THE LEGISLATION
Even more than most disputes in the public sector, those involving services performed by police and firefighters touch almost every part of the community. Growing unionism among the tremendously increasing number of employees in public service[1], has led to strikes by public employees, on the *29 one hand, and State legislation banning such strikes, on the other. (See Hildebrand, Public Sector [Dunlop & Chamberlain] Frontiers of Collective Bargaining 125, 125-126.)
In New York State that prohibition was originally accomplished through passage of the Condon-Wadlin Act.[2] That law called for severe penalties for strikers, including automatic termination, re-employment only upon forfeiture of all pay increases for three years and reduction to probationary status for five years. But, in actual operation, it turned out to be counter-productive the penalties often not being exacted even in the face of defiant and repeated strikes by some powerful municipal unions (Hildebrand, p 140), with a resultant general spread of tolerance for disregard of laws. (See, for example, Montana, Striking Teachers, Welfare, Transit and Sanitation Workers, 19 Labor LJ 273; Comment, 68 Mich L Rev 260, 269-271; Anderson, Strikes and Impasse Resolution in Public Employment, 67 Mich L Rev 943, 946-947.)
This led to replacement of Condon-Wadlin with the more ameliorative Taylor Law (Civil Service Law, §§ 200-214; Public Employees’ Fair Employment Act). Nevertheless, since many public employees continued to harbor a deep resentment at the loss of the power to strike (see, for example, Wellington and Winter, Structuring Collective Bargaining in Public Employment, 79 Yale LJ 805, 837-838), the Legislature, to lessen the likelihood of work stoppages or other labor action in the sensitive areas of public safety in which our police and firefighting personnel hold forth, enacted the amendments providing for compulsory arbitration binding on both these employees and their local government employers.
Its power to do so is, of course, bolstered by the heavy presumption of constitutionality which attaches to legislative enactments. (Matter of Van Berkel v Power, 16 NY2d 37, 40.) Keeping in mind, however, that no matter how rational its purpose, the amendment must not conflict with other provi *30 sions of the State’s statutes or its Constitution, I now turn to an examination of the specific questions raised by the cities here.
II
HOME RULE
It has been contended here that the powers given to the arbitrators are an infringement upon those reserved to local . governments.
Article IX of the State Constitution pertains to such "home rule”. It went into effect in its present form in 1964 in response to the expressed needs of local governments, who felt that, in order to cope effectively with the range of problems confronting them daily, they required the ability, the power, to respond to such problems at the local level. (See Note, Home Rule and the New York Constitution, 66 Col L Rev 1145; Grad, New York Home Rule Amendment — A Bill of Rights for Local Government?, American Bar Assn. Section of Local Govt. Law, Local Govt. Law Service Letter, June, 1964, p 6.) The issue here is whether, in the amendment to our Constitution, the power of the State Legislature to act with respect to the compensation of local public employees was . relinquished to these local governments by the State in such a way as to make it unconstitutional for the State now to act by passing the amendments to section 209 (Civil Service Law) of the Taylor Law. I shall, for brevity’s sake, paraphrase the relevant sections of article IX, emphasizing those portions of the article which are keys to the puzzle:
Section 1 of article IX, entitled "bill of rights for local governments” grants eight specific powers; none are relevant to this case.
Subdivision (a) of section 2 directs the Legislature to provide for the creation and organization of local governments in such a way as to secure to them the rights granted in this article and elsewhere in the Constitution.
Subdivision (b) of section 2 states that, subject to the bill of rights and other applicable constitutional provisions, the State Legislature shall:
(1) Enact a "Statute of Local Governments.” This section permits the Legislature to grant additional powers to local governments and specifies that powers granted pursuant to this section may only be impaired or suspended by later *31 legislative enactments passed in two successive calendar years.
(2) Have power to act in relation to the property, affairs or government of any local government only by general law requiring majority vote of the Legislature, or by special law on an emergency message from the Governor followed by a two-thirds vote.
(3) Shall have power to confer additional powers upon local governments where such powers do not relate to their property, affairs or government, and to withdraw or restrict powers so granted.
Subdivision (c) of section 2 is sufficiently important to be quoted in full:
"In addition to powers granted in the statute of local government or in any other law, (i) every local government shall have power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to its property, affairs or government and, (ii) every local government shall have power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to the following subjects, whether or not they relate to the property, affairs or government of such local government, except to the extent that the legislature shall restrict the adoption of such a local law relating to other than the property, affairs or government of such local government:
"(1) The powers, duties, qualiñcations, number, mode of selection and removal, terms of office, compensation, hours of work, protection, welfare and safety of its officers and employees, except that cities and towns shall not have such power with respect to members of the legislative body of the county in their capacities as county officers.” (Emphasis added.)
If we parse this tangled web of grants and qualifications, we find the following relevant conditions. First, if a power is granted to local governments by the Statute of Local Governments, then it can only be modified or withdrawn by two successive enactments of the Legislature. Second, as to powers not granted in the Statute of Local Governments, the Legislature may act, although, where the "property, affairs or government” of a local entity are concerned, the Legislature may only act by general law. (A special law requires specific *32 conditions and a two-thirds vote of the Legislature.) Finally, if local governments act in relation to a series of topics, including the hours and wages of employees, they may do so only as long as their actions are not inconsistent with the Constitution or any general law.
The first question to be determined here is whether section 209 of the Taylor Law is a "general” law. Article IX (§ 3, subd [d], par [1]) of our Constitution defines a general law as one "which in terms and in effect applies alike to all counties, all counties other than those wholly included within a city, all cities, all towns or all villages.” Section 3 (subd [d], par [4]) of that same article defines a "special” law as one which applies to some but not all of the entities within the categories covered under the definition of a general law. Since it applies State-wide, to all of the local entities it covers, section 209 is a general law. Authority for its enactment is contained in section 14 of article XIII of the Constitution.
The more pressing question, however, is whether the power to regulate the terms and conditions of employment of local governmental employees, specifically police and firefighters, is granted to the local governments by the Constitution or by the Statute of Local Governments, in which event it could only be impaired by two successive legislative enactments. The Constitution itself, in article IX (§ 2, subd [c], par [1]), grants localities the power to act with respect to employees only where such act is not inconsistent with the Constitution or any general law. The Statute of Local Governments,[3] enacted by the Legislature under the mandate in article IX, makes no reference whatever to regulation of employees or their wages, thus conferring no new powers upon local entities to act with respect to their employees. The Municipal Home Rule Law, enacted to implement article IX (§ 2, subd [c]), simply tracks the constitutional scheme which permits local governments to act with regard to their employees so long as their actions are not inconsistent with any general law. (Municipal Home Rule Law, § 10, subd 1, par [ii], cl a, subcl [1].) The result is that, by enactment of a general law, such as section 209 of the Taylor Law, the State may still regulate such matters.
Nevertheless, the cities here have suggested that a validation of the contested arbitration amendment amounts to an evisceration of enlarged principles of home rule guaranteed to *33 them since 1964 by the passage of article IX. I pause, therefore, to note that article IX, and the limited Statute of Local Governments which it authorized, left the Legislature’s former powers to act in the employment area unaltered. Under the Constitution, as it existed prior to the enactment of present article IX, localities had power to act in areas involving "property, affairs or government”. The Constitution of 1938 contained the same requirement that the Legislature by general law could act despite this circumscribed area of local control. (NY Const, art IX, § 12 [1938].) And the same two-thirds vote of the Legislature was required to accomplish that by passage of a special law. (NY Const, art IX, § 11 [1938].)
The Statute of Local Governments, as enacted by the Legislature, confers very few additional powers upon local governments. Moreover, the statute explicitly reserves to the State the power to rescind or modify the powers granted in the statute (see § 11, subd [d]). Indeed, it is noteworthy that this reservation undercuts the constitutional potential that powers granted by this statute may be rescinded only by a double enactment. This restricted implementation of the constitutional license, coupled with the residual power in the Legislature to act by general law, makes precedent developed under the Constitution of 1938 and earlier constitutional provisions still apt. (See Grad, American Bar Assn., Local Govt. Law Service Letter, June, 1964, p 8, Note, 66 Col L Rev 1145, 1153.)
Two propositions developed in that historical context are thus relevant to the case before us. The first of these is that grants of power to localities to act with respect to their own "property, affairs or government” should be construed narrowly. (See Salzman v Impellitteri, 305 NY 414; County Securities v Seacord, 278 NY 34; Adler v Deegam, 251 NY 467.) In the Adler case, for example, this court upheld a law which applied only to the regulation of tenement housing in cities of more than 800,000 people, despite the fact that it had not been passed by a two-thirds vote of the Legislature, on the grounds that the matter involved concérned the welfare of the entire State.
Of the words "property, affairs or government” Judge Crane said in Adler (p 473), "when the people put these words in Article XII of the Constitution [as in effect in 1929], they put them there with a Court of Appeals’ definition, not that of Webster’s Dictionary”. And Chief Judge Cardozo, concurring, *34 stated that (p 491) "if the subject be in a substantial degree a matter of State concern, the Legislature may act, though intermingled with it are concerns of the locality.”
While these statements were employed to support what was, arguably, a special law, their relevance in the context of a general law is unquestionable, all the more so in today’s immensely more interrelated society.
The. second proposition is the complement of the first: it states that the State’s power to act in ways that have” a direct effect on the affairs of local entities is to be construed broadly. (See Salzman v Impellitteri, 305 NY 414, supra; Robertson v Zimmermann, 268 NY 52; Ainslie v Lounsbery, 275 App Div 729.)
Ill
DELEGATION OF POWER
The cities argue that the amendment to section 209 is also impermissible because it delegates legislative power to ad hoc, private bodies consisting of three arbitrators.
It is settled law that a delegation of power by the Legislature to a subordinate body is constitutional, provided it is accompanied by sufficiently specific standards for its use and provided that the delegation is of power to carry out law, not power to make law. (Martin v State Liq. Auth., 43 Misc 2d 682, affd 15 NY2d 707; 8200 Realty Corp. v Lindsay, 27 NY2d 124; People v Local 365 Cemetery Workers, 33 NY2d 582; Chiropractic Assn. of N. Y. v Hilleboe, 12 NY2d 109; Matter of City of Utica v Water Pollution Control Bd., 5 NY2d 164.)
As I indicated at the outset, laws very similar to the one before us have been challenged and upheld in a number of States. (See City of Warwick v Warwick Regular Firemen’s Assn. 106 RI 109; Dearborn Fire Fighters Union, Local No. 412,1.A.F.F. v City of Dearborn, 42 Mich App 51; State ex rel. Fire Fighters Local No 946, I.A.F.F. v City of Laramie, 437 P2d 295 [Wyo]; City of Biddeford v Biddeford Teachers Assn., 304 A2d 387 [Me]; Harney v Russo, 435 Pa 183.)
In several of these cases, the courts have held that the delegation is of legislative power but that it is, nevertheless, permissible because the arbitration panel, in performing a public function, becomes a public body. (See, for example, City of Warwick, supra; City of Dearborn, supra.) In City of Biddeford (supra), the Maine court, after reviewing cases in other *35 States, rejected the rationale enunciated in the Warwick case as tautological. The Biddeford court catalogued the problems inherent in these laws and, virtually admitting that it could not explain its rationale, upheld the Maine statute on what I take to be grounds of overwhelming public need for such a procedure as compulsory arbitration. In Pennsylvania, a compulsory arbitration statute was invalidated under the State’s Constitution; it required a constitutional amendment to rescue it. (Erie Firelighters, Local No. 293 v Gardner, 406 Pa 395; Matter of City of Washington v Police Dept. of City of Washington, 436 Pa 168.)
I do not find it useful to try to determine with precision whether the particular delegation of power made here is most accurately classified as legislative, judicial, or administrative. As Professor Davis has pointed out in his classic work, when courts in the past have upheld or invalidated delegations of power, they have most frequently done so by first determining whether the delegation had a rational purpose and adequate safeguards, and only then have they applied the labels "legislative” or "administrative” — and we might add "judicial” — to the results of their assessments. (1 Davis, Administrative Law Treatise, § 2.15, pp 148-151.)
The case before us is a good example. Disputes between cities and their uniformed services generate an infinity of special circumstances and facts. No Legislature could devise a law which would deal fairly with every issue which could arise in a specific dispute. Instead, the Legislature has chosen to create a new way to handle such disputes by delegating powers which may be partly legislative, partly judicial, and partly administrative; they may even be described as sui generis. (See Mount St. Mary’s Hosp. v Catherwood, 26 NY2d 493, 503.)
One need not cavil at the fact that the mechanism thought to be needed — compulsory arbitration — defies neat categorization. Clearly the test must be not how one denominates the delegatees, but what guarantees there are against excessive or lawless exercise of their grant of power. Therefore, the focus should not be on forced classifications, but, instead, on what in fact is the scope of the delegation in a particular case and on the standards by which such a delegation is to be guarded.
A.primary evil to be avoided is the unnecessary delegation of power, however characterized, and even when otherwise amply safeguarded. But that does not mean that a broad *36 delegation is not constitutional. Where the issues to be determined by a delegated body are complex and variable, so as to call for the expenditure of an indeterminate amount of time and open-ended efforts in their resolution, and require sophistication in order to deal fairly with the parties, as in the resolution of labor disputes, a grant whose breadth is suitable to the dimension and character of the function to be performed is appropriate.
"Delegation is, after all, a matter of degree, and the amount of power which it is permissible to delegate to any agency varies with the problem involved.” (Wright, Beyond Discretionary Justice, 81 Yale LJ 575, 587.) And, as we stated in 8200 Realty Corp, (27 NY2d 124, 132, supra) "fair latitude should be allowed by the court to the legislative body to generate new and imaginative mechanisms addressed to municipal problems.” It follows that the more serious, complex, and sensitive the problem, the greater and more varied the latitude.
However, that an extensive grant is warranted does not lessen the need for safeguards. Instead, it quickens our search for them. For the desideratum should be safeguards proportionate to the grant; the larger the grant, the greater the safeguards required.
A first and most important safeguard is, of course, the provision of standards to confine the discretion of the panel. Where we have invalidated delegations of power to nonelected bodies, it was because such standards were totally lacking. (Matter of Fink v Cole, 302 NY 216; Packer Coll. Inst. v University of State of N. Y., 298 NY 184.) That is not to say that the standards supplied by the Legislature must be so specific that they leave the panel hamstrung in the face of its task. As we said in Martin v State Liq. Auth. (43 Misc 2d 682, 686, supra) in adopting the language at nisi prius: "The Legislature may constitutionally confer discretion upon an administrative agency only if it limits the field in which that discretion is to operate and provides standards to govern its exercise; but this does not mean that a precise or specific formula must be furnished in a field where flexibility and the adaptation of the legislative policy to infinitely variable conditions constitute the essence of the program and the standards or guides need only be prescribed in so detailed a fashion as is reasonably practicable in the light of the complexities of the particular area to be regulated, as necessity fixes a point *37 beyond which it is unreasonable and impracticable to compel thé Legislature to prescribe detailed rules.”
Besides prescribing guides as delimiting as is "reasonably practicable”, the standards fixed by the Legislature must also adequately protect the due process rights of the parties to whom the delegated powers are to be applied. And there must be no bias, favoritism, or substantive unfairness or illegality built into the structure of the mechanism the Legislature chooses.
Measured by these criteria, the standards set forth in the amendment to section 209 are clear and specific. The statute directs the method of selection of the arbitrators, their compensation, the procedures to be followed in granting hearings to all of the parties, the parties’ right to present evidence, the number of votes required for a binding decision and, most important, the detailed bases[4] upon which awards are to be determined. Given the idiosyncratic nature of public labor disputes, it is difficult to imagine what more the Legislature could have done to delimit the panel and to protect the rights of the parties before it.
A second safeguard required of a broad delegation of power is that some element of the decision-making power must remain in the hands of the State. So, in 8200 Realty Corp. (supra), we upheld a delegation of power to write a code of rules for just and fair enforcement of rent stablization to a private group of realtors, because the code was subject to approval by a clearly governmental agency and because affected parties who wished to dispute the application of those rules to their individual cases had access to a review panel *38 which was fully public in character. The availability of a sufficiently broad judicial review is thus directly connected to the constitutionality of the statute before us, since unlike the plan approved in 8200 Realty Corp., the PERB neither directs nor reviews the decisions of these arbitration panels.
Section 209 (subd 4, par [c], cl [vi]) of the statute provides that the determination of the arbitrators "shall not be subject to the approval of any local legislative body or other municipal authority”. That provision is not to be read as proscribing judicial review. It merely spells out removal of the former final step specified by the unamended statute which the State Legislature wished to change.
More troublesome would be the fact that the statute before us specifies that the arbitrators’ award shall be "final and binding” and makes no express provision for review, were it not for accomodations to due process standards arising out of the involuntary quality of compulsory arbitration.
So, in Mount St. Mary’s Hosp. v Catherwood (26 NY2d 493, 500, supra) we said: "At the inception it should be observed that the essence of arbitration, as traditionally used and understood, is that it be voluntary and on consent. The introduction of compulsion to submit to this informal tribunal is to change its essence. (Domke, Commercial Arbitration, p 5.) It is very easy to transfer, quite fallaciously, notions and principles applicable to voluntary arbitration to 'compulsory’ arbitration, because, by doubtful logic but irresistable usage, both systems carry the descriptive noun 'arbitration’ in their names. The simple and ineradicable fact is that voluntary arbitration and compulsory arbitration are fundamentally different if only because one may, under our system, consent to almost any restriction upon or deprivation of right, but similar restrictions or deprivations, if 'compelled by government, must accord with procedural and substantive due process.”
Therefore, we went on to say (p 502): "A statutory requirement that the determination be final * * * [in a statute which does not provide explicitly for review] does not necessarily preclude judicial review for substantiality of the evidence or procedural fairness.” (See, also, 4 Davis, Administrative Law Treatise, § 28.13, pp 67-68; § 28.20, pp 107-112.)
And (at pp 506-507) citing Guardian Life Ins. Co. v Bohlinger (308 NY 174, 183), " 'Even where judicial review is proscribed by statute, the courts have the power and the duty *39 to make certain that the administrative official has not acted in excess of the grant of authority given him by statute or in disregard of the standard prescribed by the legislature. (Cf. Matter of Barry v O’Connell, 303 NY 46, 52; People ex rel. Metropolitan Life Ins. Co. v Hotchkiss, 136 App Div 150.)’ ”
We then held that the review of arbitrations provided by CPLR article 75 could be read broadly enough to permit the constitutionally necessary assessment of procedural due process and substantiality of the evidence.
True, in the Mount St. Mary’s case, the statute did provide for article 75 review of a final and binding award, and the issue there was whether article 75 review was or could be read to be sufficient, while here the statute does not mention review. Nevertheless, as the passages cited above make clear, the rationale of that case is fully applicable. While the delegation here cannot be categorized exactly, it is sufficiently administrative so as to come within the purview of article 78 review.[5]
This analysis having led me to the conclusion that safeguards sufficient to satisfy standards requisite for constitutionality are here existent, I also find confirmation of the correctness of those views in cases arising under section 204 of the Taylor Law.
Section 204, since 1967, has required public employers to negotiate agreements covering terms and conditions of employment with the recognized representatives of their employees. One of the items which is to be so negotiated is a means whereby grievances relating to the other terms and conditions agreed upon are to be resolved. Though in theory the choice of arbitration is voluntary, such agreements almost invariably provide for arbitration, and disputes subject to such "grievance arbitration” can cover the entire range of the rights embodied in the collective bargaining agreement. Whether they are more or less substantial than those involved in an arbitration to fix the terms of an agreement itself (so-called "interests arbitration”) is a matter of happenstance. *40 (For instance, the arbitration of a wage-reopening clause in a particular existing agreement could involve a great deal more money than would have been at stake if the remaining gap between the negotiating parties had been arbitrated when the original agreement was entered into.) In short, grievance arbitrators, chosen by the parties and operating under section 204 contracts, may be just as pre-emptive of local legislative perogative to fix wages and other employment terms of public employees as are the panels to be set up under the amendments before us. In both cases, the arbitration awards are binding on the employing governmental units involved.
Yet, we have repeatedly and emphatically indicated that arbitration is the preferred method. of settling grievances under section 204 contracts and have upheld such arbitration clauses against a variety of challenges, finding that, so long as the arbitrators operate within the terms of a contract, they may make any award they think justified unless it is specifically forbidden by statute. (See Matter of Associated Teachers of Huntington v Board of Educ., 33 NY2d 229; Board of Educ. v Associated Teachers of Huntington, 30 NY2d 122; and see Board of Educ. of Chautaqua Cent. School Dist. v Chautaqua Cent. School Teachers Assn., 41 AD2d 47; Matter of Board of Educ., Town of North Hempstead v Great Neck Teachers Assn., 69 Misc 2d 1061, affd 40 AD2d 950; Board of Educ. v Grand Is. Teachers’ Assn., 67 Misc 2d 859, affd 38 AD2d 669; City of Auburn v Nash, 34 AD2d 345; Matter of Teachers Assn. Cent. High School Dist. No. 3 v Board of Educ., 61 Misc 2d 492, revd 34 AD2d 351; Board of Educ. v Cracovia, 36 AD2d 851; see, generally, Ruffo, Residue of Sovereignty In New York Public Employment, 39 Albany L Rev 165).
In all of these cases, the disputes turned on questions of the parties’ rights under the substantive terms of the contract they had signed. The arbitrators made their decisions within the limitations of the contracts themselves, rather than in terms of statutory law. These contracts were the products of an admixture of both employee and employer input. Under the amendment before us, the arbitration panels have no contracts to guide and limit them. But, in making their awards in the context of employee and governmental interests rather than contractual rights, each panel operates under the stringent statutory limitations provided by the Legislature alone, and subject to review which includes the substantiality of the evidence and the degree of due process granted to the *41 parties. Therefore, except for the substitution of statutory standards for contractual ones, and the correspondingly broader review of arbitrations pursuant to the statute, the interests arbitrators’ relationship to the parties under the amendments here is not unlike that of grievance arbitrators operating under a public employment contract, particularly since the duty to contract for a method of grievance settlement is statutorily imposed.
IV
TAXATION POWER AND EQUAL PROTECTION
Turning briefly to other issues, I do not find the arbitrators’ power tc decide disputed labor demands constitutes a delegation of power to impose taxes, whether by way of invasion of local governments’ authority to do so or otherwise. The panels’ decisions no doubt may affect the cost of police and firefighters’ services to their local governments, but the cities or towns for whom they work remain free to make their own decisions as to how they will meet such cost, whether by taxation, cutbacks in spending or other means. (See Dearborn Firefighters Union, Local No. 412, I.A.F.F. v City of Dearborn, 42 Mich App 51, supra.)
An act of taxation and an act which may result in the need for taxation are two different things. As we said long ago: "This act of 1855 does not impose a tax of any kind, either state or municipal. Its provisions may, and no doubt will, lead to the necessity of local taxation; and the same thing may be said of every act of legislation under which an expenditure for general or local purposes may, in any contingency, be required.” (Darlington v City of New York 31 NY 164, 186.) (See, also, Salzman v Impellitteri, 203 Misc 2d 486, affd 305 NY 414, supra; Board of Educ. of Tri-Val. Cent. School Dist. No. 1 v Board of Coop. Educational Servs. of Sullivan County, 37 AD2d 330, affd 31 NY2d 1020; Metropolitan Transp. Auth. v County of Nassau, 28 NY2d 385.)
Finally, the amendment, which provides that each of the two parties to a dispute shall appoint one arbitrator, and that those two shall choose the third, does not run afoul of the one-man — one-vote principle. Sailors v Board of Educ. (387 US 105), Avery v Midland County (390 US 474), and Hadley v Junior Coll. Dist. (397 US 50) stand for the proposition that when the officials to be chosen exercise general legislative *42 powers, they must be chosen on a one-man — one-vote basis. New York law adheres to the same distinction. (See Berger-man v Lindsay, 58 Misc 2d 1013, affd 25 NY2d 405; Shanker v Regents of Univ. of State of N. Y., 27 AD2d 84, affd 19 NY2d 951; Seaman v Fedourich, 16 NY2d 94.) But, as we have already indicated, the power of the panels here, however denominated, is not purely legislative. It is, therefore, squarely within the holding in Sailors (supra).
For all these reasons, I find section 209 of the Taylor Law constitutional.
Chief Judge Breitel and Judges Gabrielli, Jones, Wachtler and Cooke concur with Judge Jasen; Judge Fuchsberg concurs in result in a separate opinion.
In City of Amsterdam v Helsby: Appeals transferred to the Appellate Division, Third Department, without costs.
In City of Buffalo v New York State Employment Relations Bd.: Judgment affirmed, without costs.

. The numbers of public employees are growing rapidly. By 1964 there were *29 approximately seven and one-half million employees at the State and local levels; about half a million of them belonged to unions. Eight years later, there were over 10 million employees at State and local" levels; 27% of them belonged to unions. (McAvoy, Binding Arbitration of Contract Terms: A New Approach to the Resolution of Disputes in the Public Sector, 72 Col L Rev 1192; see, also, Hildebrand, Public Sector [Dunlop & Chamberlain], Frontiers of Collective Bargaining 125, 125-126.) Recent statistics tell us that more than 160,000 firefighters are unionized. There is a like trend toward police unionization. (Stieber, Public Employee Unionism, Studies of Unionism in Government, Brookings Institute 7-8.)

. Chapter 391 of the Laws of 1947.

. Chapter 205 of the Laws of 1964.

. Section 209 (subd 4, par [c], cl [v]) reads: "(v) the public arbitration panel shall * ** * so far as it deems them applicable, take into consideration the following and any other relevant circumstances:
"a. comparison of the wages, hours and conditions of employment of the employees involved in the arbitration proceeding with the wages, hours, and conditions of employment of other employees performing similar services or requiring similar skills under similar working conditions and with other employees generally in public and private employment in comparable communities.
"b. the interests and welfare of the public and the financial ability of the public employer to pay;
"c. comparison of peculiarities in regard to other trades or professions, including specifically, (1) hazards of employment; (2) physical qualifications; (3) educational qualifications; (4) mental qualifications; (5) job training and skills;
"d. such other factors which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment.”

. CPLR article 75 specifies, as a prerequisite to review, a written agreement to arbitrate. While the Legislature may by statute suspend that requirement, as it did in the statute litigated in Mount St. Mary’s Hosp. (supra), it has not suspended it here. The requisite due process and evidentiary review is, however, a part of CPLR article 78, which is applicable to administrative acts. (See, generally, Barr, Public Arbitration Panel as an Administrative Agency: Can Compulsory Interest Arbitration Be An Acceptable Dispute Resolution Method in the Public Sector?, 39 Albany L Rev 377.)