82 N.Y.2d 101 (1993)
623 N.E.2d 1140
603 N.Y.S.2d 790
In the Matter of Brooklyn Heights Association, Inc., et al., Respondents,
v.
Frank J. Macchiarola et al., as Members of the New York City Districting Commission, et al., Appellants.
Court of Appeals of the State of New York.
Argued August 25, 1993.
Decided September 7, 1993.
O. Peter Sherwood, Corporation Counsel of New York City (Joel Berger, Fred Kolikoff and David Drueding of counsel), for appellants.
Cravath, Swaine & Moore, New York City (Francis P. Barron and David M. Kroeger of counsel), for respondents.
Wolfson & Carroll, New York City (John W. Carroll of counsel), for City Council Member Joan Griffin McCabe, amicus curiae.
Chief Judge KAYE and Judges SIMONS, HANCOCK, JR., BELLACOSA and SMITH concur in Per Curiam opinion; Judge TITONE dissents and votes to affirm in a separate opinion.
*103 Per Curiam.
In 1989, the structure of the New York City Board of *104 Estimate was declared unconstitutional because it violated the Equal Protection guarantee of "one person, one vote" (New York City Bd. of Estimate v Morris, 489 US 688). Consequently, the Board of Estimate was abolished and some of its powers, by vote of the electorate of New York City, were transferred to the City Council, which in 1991 was expanded from 35 to 51 members (NY City Charter § 22). The task of redrawing the Council districts was assigned under the referendum to the bipartisan City Districting Commission, appointed by the Council and the Mayor (Charter § 50).
The Charter set forth a number of requirements for the districting plan. Each district, for example, was to "be contiguous" (Charter § 52 [2]), and the Commission was required to use the "final count results" of the 1990 census (Charter § 1152 [d] [11] [b]).
The Charter additionally set forth seven criteria which were to be applied "to the maximum extent practicable" and given "priority in the order in which they are listed" (Charter § 52 [1]). Two of these are particularly relevant here  the second-ranked priority mandating "fair and effective" representation of minorities, and the third requiring that "[d]istrict lines shall keep intact neighborhoods and communities with established ties of common interest and association, whether historical, racial, economic, ethnic, religious or other." (Charter § 52 [1] [b], [c].)
For census purposes, the United States Census Bureau divided the City into 33,559 tabulation blocks, which are the smallest geographic units for which official census counts are available. As a result, the Commission adopted two policies: it would create districts by grouping together tabulation blocks, and it would not divide any tabulation blocks.
The focus of this litigation is tabulation block 105 in Brooklyn, which runs more than one mile along the waterfront, from the Brooklyn Battery Tunnel to Old Fulton Street. Block 105 consists primarily of warehouses and industrial buildings, and official 1990 census data  which the Commission was bound to accept (Charter § 1152 [d] [11] [b])  reported 47 residents. Extending from block 105 into the East River are 10 unpopulated piers, each its own tabulation block.
In pursuit of the second-ranked priority of ensuring fair and effective minority representation (Charter § 52 [1] [b]), the Commission chose to make District 38, which included the Sunset Park and Red Hook areas, a Latino-majority district. *105 To do so, however, it was necessary to annex a noncontiguous area of Latinos living along Atlantic Avenue. Accordingly, a "land bridge" of 11 tabulation blocks  including block 105  was created to link the noncontiguous area with the rest of the district. By virtue of the Commission's policy of not splitting tabulation blocks, however, the lengthy waterfront also became a part of District 38, though it was not geographically necessary to include the entire waterfront as part of the land bridge. The piers adjacent to block 105 were placed in District 1 in Manhattan  the border between Manhattan and Brooklyn being "the low-water mark on the shore of Long Island" (Administrative Code of City of NY § 2-202 [1]; see also, § 2-202 [3]; Charter § 52 [1] [e] [fifth-ranked criteria is that a "district shall not cross borough or county boundaries"]).
Residents and civic groups in Brooklyn Heights, a neighborhood in District 33, objected to the districting plan because, in their view, the part of tabulation block 105 north of Atlantic Avenue and the adjacent five piers historically have been a part of Brooklyn Heights and thus should have been placed in District 33. Arguing that the plan violated the intact-neighborhoods requirement of Charter § 52 (1) (c), they commenced a CPLR article 78 proceeding seeking to have the district lines redrawn to include this territory within their Council district.
Supreme Court granted the petition, finding an "historic and unique relationship" between Brooklyn Heights and the waterfront, and concluding that the Commission's refusal to split block 105 was arbitrary and capricious. The Appellate Division, with two Justices dissenting, affirmed, noting that "petitioners' proof clearly established that the relevant portion of census tabulation block 105 has historically been considered a part of the Brooklyn Heights neighborhood" and that under these facts, the Commission's decision not to divide block 105 "served no real purpose." (192 AD2d 22, 27, 28.) The dissent opined that ever since the construction of the Brooklyn-Queens Expressway (BQE) in the 1950s, Brooklyn Heights has been effectively separated from the waterfront and thus the intact-neighborhoods requirement is not implicated here, and that in any event, the Commission's policy of not dividing tabulation blocks was not arbitrary or capricious. The City appealed to this Court as of right (CPLR 5601 [a]).
Although the City contends that a "neighborhood" within the meaning of Charter § 52 (1) (c) can consist only of people, *106 not unpopulated parcels of land, and thus residents of Brooklyn Heights cannot claim that the waterfront is part of their neighborhood, we need not resolve that issue today. Even assuming for purposes of this appeal that the disputed portion of the waterfront is part of the Brooklyn Heights neighborhood, we conclude that the petition should be dismissed.
The Commission was required to use the "final count results" of the 1990 census (Charter § 1152 [d] [11] [b]), and determined that it could best effectuate this mandate by building districts from tabulation blocks, the smallest geographical units for which census data was available. The Commission's policy choice not to split tabulation blocks implemented the Charter's requirement that census data be used in creating districts. Indeed, even the dissent acknowledges that "in most instances" the Commission cannot be asked to split a tabulation block (dissenting opn, at 110). It is not our role to second-guess the Commission's reasonable policy choice related to implementing the technical requirements of districting (see, Matter of Wolpoff v Cuomo, 80 N.Y.2d 70, 79).
By contrast to the unequivocal mandate that census "final count results" be used, the Charter did not impose strict adherence to the seven ranked criteria, instead requiring only that the criteria be applied "to the maximum extent practicable" (Charter § 52 [1]; emphasis added). Thus, the Charter contemplated the need for flexibility in the Commission's execution of what the United States Department of Justice described as "a job of staggering proportions" and "an enormous task [that] necessarily involved many compromises and difficult choices." Since we are satisfied that the Commission's policy was not arbitrary and capricious (CPLR 7803 [3]), but was directly and reasonably related to implementing the census requirement, our review is at an end (contrast, Matter of Wolpoff v Cuomo, 80 NY2d, at 80 [constitutional challenge to legislative action]).
In view of our conclusion with regard to block 105, it is unnecessary to consider the disposition of the five disputed piers, because they would not be contiguous to District 33 in any event (see, Charter § 52 [2]).
Accordingly, the order of the Appellate Division should be reversed, without costs, and the petition dismissed.
TITONE, J. (dissenting).
In upholding the final City Council redistricting plan adopted by the New York City Districting Commission, the majority has deferred to what it deems the *107 Commission's "reasonable policy choice" of maintaining the integrity of census tabulation blocks. In so ruling, the Court has discounted the importance of preserving neighborhood integrity and has, in effect, rewritten the New York City Charter provisions governing redistricting. Since, in my view, the challenged portion of the redistricting plan was not drafted in accordance with those Charter provisions, I dissent from the Court's holding.
Section 52 of the City Charter establishes the criteria to be followed in creating new districts for the recently expanded City Council. The primary goal declared in the statute is equalization of the population encompassed within each district (NY City Charter § 52 [1] [a]). Deviations beyond a certain permissible range are permitted only when "justified by the other criteria set forth in [the statute]" (id.). Those criteria are, in turn, set forth in the order of their importance, and they are specifically required to "be applied and given priority in the order in which they are listed" "to the maximum extent practicable" (id., § 52 [1]).
This dispute concerns the first two of the latter class of criteria. Section 52 (1) (b) requires that the plan "be established in a manner that ensures the fair and effective representation of the racial and language minority groups in New York city which are protected by the United States [V]oting [R]ights [A]ct of [1965]." Section 52 (1) (c) requires that the district lines "keep intact neighborhoods and communities with established ties of common interests and association, whether historical, racial, economic, ethnic, religious or other." In other words, assuming that the population deviations are kept within the permissible range, the Commission is directed first to consider the goal of ensuring fair and effective minority representation and then, "to the maximum extent practicable," to draw district lines in such a way as to preserve the integrity of established neighborhoods and communities.
There is no dispute here that the goal of ensuring fair and effective minority representation was considered and implemented. The Commission combined Sunset Park and Red Hook, two Brooklyn neighborhoods with high Latino populations, so that the resulting district would have enough members of that group to form a voting majority. Indeed, the Commission even went so far as to create a "land bridge" joining the two communities in order to advance the minority-representation *108 goal without violating the independent statutory requirement of contiguity (see, id., § 52 [2]). Again, neither the creation nor the siting of this "land bridge" are challenged in this proceeding.
Petitioners' only quarrel with the Commission's plan in regard to the Sunset Park-Red Hook district is its decision to include in the connecting "land bridge" the entirety of the geographical entity known as census tabulation block 105, which runs along the Brooklyn waterfront from the Battery Tunnel to Old Fulton Street. According to petitioners, a portion of this block, along with the adjacent six Port Authority piers (Piers 1 through 6) that were included in Manhattan's District 1, are contained within the area that has historically been considered part of the Brooklyn Heights neighborhood. Inasmuch as there was no sound reason for excising this small zone from the Council district that encompasses Brooklyn Heights, petitioners contend, the statutory criteria, specifically section 52 (1) (c)'s neighborhood-integrity provision, were not properly observed and the redistricting plan is, consequently, defective.[1]
Respondents' initial contention that census tabulation block 105 and the adjacent piers are not part of the Brooklyn Heights neighborhood lacks merit and need not be discussed at great length.[2] The main thrust of the present dispute is *109 respondents' alternative contention that the Districting Commission was not required to give controlling weight to section 52 (1) (c)'s neighborhood-integrity criterion in this instance because of the overriding importance of maintaining the integrity of census tabulation blocks as the basic geographic units for designing City Council districts. Respondents stress that the use of these census tabulation blocks, which are the smallest geographical units for which United States Census Bureau population figures are available, is the only feasible method of determining the population in a given area. And, according to respondents, a strict rule keeping these blocks inviolate is essential for ensuring compliance with the Charter provision requiring that the Commission "utilize the final count results of the [1990] census" in determining the new Council district lines (NY City Charter § 1152 [d] [11] [b]; see also, Seaman v Fedourich, 16 N.Y.2d 94, 104).
Although it does not suggest that unflagging adherence to the census tabulation block units is necessary or required, the majority has upheld the Commission's actions on the theory that the Commission's insistence on the inviolability of census tabulation blocks is a "reasonable" and nonarbitrary policy choice made to implement the requirement that census data be used as the statistical basis for redistricting. Concluding that "[i]t is not our role to second-guess the Commission's reasonable policy choice related to implementing the technical requirements of districting" (majority opn, at 106), the majority holds that the courts have no further duty or responsibility to interfere with the Commission's decision. In my view, however, this analysis represents a misreading of the statutory mandate.
Under that mandate, the Commission is clearly not free to make its own policy choices regarding such values as minority representation and preserving neighborhood integrity. Moreover, in view of the clear language of the Charter provisions, the Commission cannot be deemed to have been given unfettered discretion to employ any methodology it wishes to *110 implement the Charter's technical requirements, regardless of that methodology's impact on the realization of those values. To the contrary, when the Legislature mandated that the criteria delineated in section 52 (1) be considered and applied "to the maximum extent practicable," it limited the Commission's freedom to choose among the various "reasonable" methods of implementing the "technical" aspects of redistricting and, in effect, directed that, wherever possible, those methods must be harmonized with the Charter provision's substantive goals.
Thus, unlike the majority, I would not read the "technical" requirements of the Charter such as section 1152 (d) (11) (b) to be free-standing standards that exist and may be "implemented" independently and without regard to the values expressed in section 52 (1). Accordingly, contrary to the majority's view, I would conclude that the courts cannot simply defer to the Commission's policy choices with regard to technical implementation after examining them for rationality. Regardless of whether those policy choices are "reasonable" or otherwise, the courts are responsible for ensuring that the Commission adheres to its statutory mandate by adopting policies that promote the legislatively declared criteria or at least do not unnecessarily undermine them.
Viewed in that light and under the circumstances presented in this case, the Commission's insistence on keeping census tabulation blocks intact cannot be upheld. It is true that, in most instances, the Commission cannot be asked to split census tabulation blocks because there would then be no realistic way of determining the population within the subdivided geographical entities. In those situations, the value of preserving neighborhood integrity must give way, since adherence to it would not be "practicable."
In this case, however, the entire tabulation block in dispute has, at most, only 47 souls residing within its borders. Respondents cannot  and do not  seriously contend that so small a population could have any legally or politically significant impact on the size or ethnic character of a Council district, regardless of how it is distributed. Thus, apart from the abstract theoretical value of keeping census tabulation blocks inviolate, there is no real reason why census tabulation block 105 in particular could not be subdivided in the interest of preserving the integrity of the Brooklyn Heights neighborhood.
*111 Manifestly, the goal of preserving the natural boundaries of that community is not rendered "impracticable" because of the abstract benefit the Commission perceives in keeping all tabulation blocks intact and undivided. The Commission certainly could have subdivided tabulation block 105 so as to keep the small area between the Battery Tunnel and Old Fulton Street within the district covering Brooklyn Heights without either disturbing the Latino majority in the newly drawn Sunset Park-Red Hook district or creating a meaningful risk of population imbalance.
Thus, contrary to the majority's suggestion, the negative impact of the Commission's effort to satisfy section 52 (1) (b) on the "lower priority" goal of neighborhood integrity was not "incidental." Rather, it was, at best, gratuitous, perhaps even arbitrary. Certainly, in light of the relatively trivial, and indeed barely articulable, value to be served by preserving the inviolability of census tabulation block 105, it cannot be said that the Commission acted to "keep intact" the Brooklyn Heights community "to the maximum extent practicable." Accordingly, the mandate of the City Charter was not obeyed and the Commission's districts were properly modified. For that reason, I dissent and vote to affirm the order of the Court below.
Order reversed, etc.
NOTES
[1] The focus of the parties' arguments, as well as of the decisions below, is the placement of the disputed section of census tabulation block 105. For that reason, both the majority opinion and this dissent are primarily concerned with that question. I would note, however, that respondents have offered no real justification at all for including the piers adjacent to census tabulation block 105 in a Council district that covers an area in lower Manhattan. The only explanation for this seeming anomaly that respondents have offered is the fact that the border of New York County is technically represented by the low water mark at the Brooklyn side of New York Harbor and, as a result, the computer program used to assist in the redistricting process annexed the adjoining pier area to the nearest district in New York County. In my view, that explanation does not furnish an adequate basis for removing the piers from the Council district covering Brooklyn Heights, the neighborhood of which they are a part.
[2] As the lower courts concluded, the considerable evidence adduced by petitioner supports the position that the disputed waterfront area was historically considered part of the Brooklyn Heights neighborhood. Inasmuch as a "historic" connection with the neighborhood is sufficient under Charter § 52 (1) (c), the fact that the waterfront may have been separated from the other sections of the neighborhood as a result of the construction of an intersecting highway is not dispositive. Similarly unpersuasive is respondents' contention that the largely uninhabited waterfront strip cannot be part of the "neighborhood" because, as used in Charter § 52 (1) (c), that term denotes groupings of people, not places. A neighborhood consists not only of the people who reside therein, but also of the physical features  its churches, parks, libraries and geographical landmarks, that give it its character (see, Websters Deluxe Unabridged Dictionary 1203 [2d ed 1983]). There is no basis for assuming that the drafters of the City Charter intended to suggest a more limited meaning when they used the term "neighborhood" in section 52 (1) (c).