OPINION OF THE COURT
Per Curiam.
In 1989, the structure of the New York City Board of *104 Estimate was declared unconstitutional because it violated the Equal Protection guarantee of "one person, one vote” (New York City Bd. of Estimate v Morris, 489 US 688). Consequently, the Board of Estimate was abolished and some of its powers, by vote of the electorate of New York City, were transferred to the City Council, which in 1991 was expanded from 35 to 51 members (NY City Charter § 22). The task of redrawing the Council districts was assigned under the referendum to the bipartisan City Districting Commission, appointed by the Council and the Mayor (Charter § 50).
The Charter set forth a number of requirements for the districting plan. Each district, for example, was to "be contiguous” (Charter § 52 [2]), and the Commission was required to use the "final count results” of the 1990 census (Charter § 1152 [d] [11] [b]).
The Charter additionally set forth seven criteria which were to be applied "to the maximum extent practicable” and given "priority in the order in which they are listed” (Charter § 52 [1]). Two of these are particularly relevant here — the second-ranked priority mandating "fair and effective” representation of minorities, and the third requiring that "[district lines shall keep intact neighborhoods and communities with established ties of common interest and association, whether historical, racial, economic, ethnic, religious or other.” (Charter § 52 [1] [b], M.)
For census purposes, the United States Census Bureau divided the City into 33,559 tabulation blocks, which are the smallest geographic units for which official census counts are available. As a result, the Commission adopted two policiés: it would create districts by grouping together tabulation blocks, and it would not divide any tabulation blocks.
The focus of this litigation is tabulation block 105 in Brooklyn, which runs more than one mile along the waterfront, from the Brooklyn Battery Tunnel to Old Fulton Street. Block 105 consists primarily of warehouses and industrial buildings, and official 1990 census data — which the Commission was bound to accept (Charter § 1152 [d] [11] [b]) — reported 47 residents. Extending from block 105 into the East River are 10 unpopulated piers, each its own tabulation block.
In pursuit of the second-ranked priority of ensuring fair and effective minority representation (Charter § 52 [1] [b]), the Commission chose to make District 38, which included the Sunset Park and Red Hook areas, a Latino-majority district. *105 To do so, however, it was necessary to annex a noncontiguous area of Latinos living along Atlantic Avenue. Accordingly, a "land bridge” of 11 tabulation blocks — including block 105— was created to link the noncontiguous area with the rest of the district. By virtue of the Commission’s policy of not splitting tabulation blocks, however, the lengthy waterfront also became a part of District 38, though it was not geographically necessary to include the entire waterfront as part of the land bridge. The piers adjacent to block 105 were placed in District 1 in Manhattan — the border between Manhattan and Brooklyn being "the low-water mark on the shore of Long Island” (Administrative Code of City of NY § 2-202 [1]; see also, § 2-202 [3]; Charter § 52 [1] [e] [fifth-ranked criteria is that a "district shall not cross borough or county boundaries”]).
Residents and civic groups in Brooklyn Heights, a neighborhood in District 33, objected to the districting plan because, in their view, the part of tabulation block 105 north of Atlantic Avenue and the adjacent five piers historically have been a part of Brooklyn Heights and thus should have been placed in District 33. Arguing that the plan violated the intact-neighborhoods requirement of Charter § 52 (1) (c), they commenced a CPLR article 78 proceeding seeking to have the district lines redrawn to include this territory within their Council district.
Supreme Court granted the petition, finding an "historic and unique relationship” between Brooklyn Heights and the waterfront, and concluding that the Commission’s refusal to split block 105 was arbitrary and capricious. The Appellate Division, with two Justices dissenting, affirmed, noting that "petitioners’ proof clearly established that the relevant portion of census tabulation block 105 has historically been considered a part of the Brooklyn Heights neighborhood” and that under these facts, the Commission’s decision not to divide block 105 "served no real purpose.” (192 AD2d 22, 27, 28.) The dissent opined that ever since the construction of the Brooklyn-Queens Expressway (BQE) in the 1950s, Brooklyn Heights has been effectively separated from the waterfront and thus the intact-neighborhoods requirement is not implicated here, and that in any event, the Commission’s policy of not dividing tabulation blocks was not arbitrary or capricious. The City appealed to this Court as of right (CPLR 5601 [a]).
Although the City contends that a "neighborhood” within the meaning of Charter § 52 (1) (c) can consist only of people, *106 not unpopulated parcels of land, and thus residents of Brooklyn Heights cannot claim that the waterfront is part of their neighborhood, we need not resolve that issue today. Even assuming for purposes of this appeal that the disputed portion of the waterfront is part of the Brooklyn Heights neighborhood, we conclude that the petition should be dismissed.
The Commission was required to use the "final count results” of the 1990 census (Charter § 1152 [d] [11] [b]), and determined that it could best effectuate this mandate by building districts from tabulation blocks, the smallest geographical units for which census data was available. The Commission’s policy choice not to split tabulation blocks implemented the Charter’s requirement that census data be used in creating districts. Indeed, even the dissent acknowledges that "in most instances” the Commission cannot be asked to split a tabulation block (dissenting opn, at 110). It is not our role to second-guess the Commission’s reasonable policy choice related to implementing the technical requirements of districting (see, Matter of Wolpoff v Cuomo, 80 NY2d 70, 79).
By contrast to the unequivocal mandate that census "final count results” be used, the Charter did not impose strict adherence to the seven ranked criteria, instead requiring only that the criteria be applied "to the maximum extent practicable” (Charter § 52 [1]; emphasis added). Thus, the Charter contemplated the need for flexibility in the Commission’s execution of what the United States Department of Justice described as "a job of staggering proportions” and "an enormous task [that] necessarily involved many compromises and difficult choices.” Since we are satisfied that the Commission’s policy was not arbitrary and capricious (CPLR 7803 [3]), but was directly and reasonably related to implementing the census requirement, our review is at an end (contrast, Matter of Wolpoff v Cuomo, 80 NY2d, at 80 [constitutional challenge to legislative action]).
In view of our conclusion with regard to block 105, it is unnecessary to consider the disposition of the five disputed piers, because they would not be contiguous to District 33 in any event (see, Charter § 52 [2]).
Accordingly, the order of the Appellate Division should be reversed, without costs, and the petition dismissed.